[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10206
_____

D.C. Docket No. 0:13-CV-60349-RLR

PAUL STEPHENS,

Plaintiff - Appellant,

versus

NICK DEGIOVANNI, individually,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 30, 2017)

Before MARCUS and FAY, Circuit Judges, and FRIEDMAN,* District Judge.

_____

*Honorable Paul L. Friedman, United States District Judge for the District of Columbia, sitting
by designation.

FAY, Circuit Judge:

Paul Stephens appeals summary judgment granted to Broward Deputy Sheriff Nick DeGiovanni based on qualified immunity in his 42 U.S.C. § 1983 action, alleging false arrest and excessive force. We affirm summary judgment granted to Deputy DeGiovanni on Stephens's false-arrest claim, but we vacate summary judgment granted to Deputy DeGiovanni on Stephens's excessive-force claim, since Deputy DeGiovanni is not protected by qualified immunity because of the force he used in arresting Stephens on misdemeanor charges. We remand for proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Encounter Sequence

On the evening of February 16, 2009, Paul Stephens, who is a black Jamaican and an automobile mechanic by trade, and his cousin, Roan Greenwood, also a black Jamaican male, were the invited guests of Greenwood's girlfriend, Claudia White, who resided at 4001 NW 34th Street, Apartment 205, Fort Lauderdale, Florida 33319.[1] White's apartment was on the second floor of the Shoppes of St. Croix, a complex with businesses on the first floor and apartments on the second floor. The doorway leading to White's second-floor apartment was

---

[1] The factual background is derived from Stephens's amended pro se complaint; his original Affidavit; his Second Affidavit filed with his Motion for Reconsideration of the attached Order Granting Summary Judgment for Deputy DeGiovanni with "Plaintiff's Account of the Facts"; Roan Greenwood's Affidavit; Claudia White's Affidavit; and the "Undisputed Statement of Facts" in Deputy DeGiovanni's Summary Judgment Motion.

on the first floor.  Stephens and Greenwood were checking a car, owned by Stephens's girlfriend, that she was planning to sell to White at her request, because the check-engine light came on prior to the car being parked.  The car was not parked in a space designated for retail parking.

The car door was open on the driver's side; Stephens was sitting on the metal frame of the driver's doorway, with both feet out of the vehicle and on the ground; Greenwood was sitting in the front-passenger seat.  During his checking the car, Stephens had used a diagnostic scanner to determine what was wrong with the engine.  When Stephens used the scanner, the car ignition was operating.

At 8:15 P.M., Deputy DeGiovanni was on road patrol, assigned to Lauderdale Lakes.  Aware of recent burglaries in the area, and because it was late and all of the businesses in the Shoppes of St. Croix were closed, he decided to investigate.  Deputy DeGiovanni, who is white, initially drove past the car in which Stephens and Greenwood were sitting; he then reversed his patrol car, parked behind the car being checked, exited his vehicle, and approached Stephens, who remained seated.  When Deputy DeGiovanni drove into the Shoppes of St. Croix, stopped his patrol car, and approached the car, Stephens was no longer using the scanner; the ignition and engine of the car were off.  Deputy DeGiovanni's first words to Stephens were: "What are you two doing over here?"  When Stephens answered he and Greenwood were chatting, Deputy DeGiovanni

3

said: "You two are not supposed to be over here."  Stephens responded they were invited guests of Claudia White, who lived at the Shoppes of St. Croix, which Greenwood confirmed.  To prove this fact to Deputy DeGiovanni, Greenwood used the key White had given them to unlock the door on the first floor, giving access to her second-floor apartment, and unlocked the door.

Deputy DeGiovanni turned away from Stephens and Greenwood and returned to his patrol car.  Thereafter, one or two other police cars turned into the Shoppes of St. Croix and were driving toward the car being checked, where Stephens and Greenwood were sitting.  Deputy DeGiovanni returned to Stephens and asked for identification, but he did not ask for a driver's license.  Stephens stood up to give Deputy DeGiovanni his identification; while standing, Stephens asked Deputy DeGiovanni: "What is the problem?"  Ignoring Stephens's question, Deputy DeGiovanni said: "Give me your ID."  Stephens gave Deputy DeGiovanni his State of Florida identification card.  On February 16, 2009, Stephens possessed a driver's license issued in Jamaica.

While he was standing, Stephens's cellular phone rang.  When he answered the phone using the Bluetooth device on his right ear, Deputy DeGiovanni unexpectedly slapped the Bluetooth from Stephens's ear and stated: "Who told you to answer the phone?"  Stephens then asked Deputy DeGiovanni to get a field supervisor on the scene.  Deputy DeGiovanni responded by saying: "Shut your

4

damn mouth." For no reason, Deputy DeGiovanni, using his full body weight, slugged Stephens hard in his chest, slamming him into the driver's seat.

Stephens stood up and asked Deputy DeGiovanni: "Why are you doing this?" Deputy DeGiovanni hit Stephens a second time with a blow to his chest, thrusting him into the driver's seat. With the air knocked out of his lungs, Stephens got up and said to Deputy DeGiovanni: "The kids are upstairs looking at you. What kind of example are you setting for the kids?"[2] Deputy DeGiovanni battered Stephens a third time by stepping on Stephens's left foot while simultaneously and forcefully grabbing him by the neck and slamming him backward, which threw Stephens against the car-door frame. Stephens's head hit in the space between the open driver's door and the car, and his head and neck slammed into the car-door jamb.[3] Stephens, who was seriously injured, reached up with his right hand to grab the car door to lift himself up. Deputy DeGiovanni then grabbed Stephens's right hand and twisted it so the palm of his hand faced up; he

---

[2] White attested her apartment was on the second floor of the Shoppes of St. Croix, and the entry way that led to her apartment overlooked the parking spaces where the car was parked that night, February 16, 2009. Her children were watching the incident from her apartment balcony. White's Aff. at 1 ¶ 2. She further explained she "was not there when Paul Stephens was arrested," because she was "shopping at a nearby Wal-Mart." *Id.* at 2 ¶ 4. While she was in line to pay for her items at Walmart, she received a call from her son, who had called her crying and stated: "Paul Stephens[] was being arrested." *Id.*

[3] In his amended pro se complaint, Stephens described Deputy DeGiovanni's conduct following Stephens's comment about the children watching Deputy DeGiovanni: "DeGIOVANNI then, without any valid reason or provocation, shoved me using his full body weight and with his hand pushing just below my neck, causing me to fall backwards into the door jamb of the vehicle, with the back of my neck striking the vehicle." Am. Compl. at 3 ¶ 12.

5

also forced the last three fingers on Stephens's right hand backward toward his forearm, causing all of Stephens's body weight to be placed on those three fingers of his right hand.

After Stephens was standing and while Deputy DeGiovanni still had those three fingers of Stephens's right hand bent backwards, Deputy DeGiovanni told Stephens to turn around, and he handcuffed him.  He did not tell Stephens he was under arrest or why he was arresting him.  Because the handcuffs were quite tight, causing Stephens to lose the feeling in his hands, he asked Deputy DeGiovanni to loosen the handcuffs.  Deputy DeGiovanni responded: **"It's punishment.  You people come here and think you can do as you please."**  Am. Compl. at 4 ¶ 15. Deputy DeGiovanni did not adjust the handcuffs on Stephens for almost three hours.

At no time did Stephens resist being handcuffed by Deputy DeGiovanni. Greenwood told Deputy DeGiovanni the two had done nothing wrong; Deputy DeGiovanni told Greenwood "to stay back or he would be arrested, too."  During the encounter, Stephens did not raise his voice, say anything threatening, or make any aggressive gestures.[4]  Stephens averred: "At no time did Deputy DeGiovanni

---

[4] The unsworn statements in the declarations regarding Stephens's complaints about the handcuffs being too tight and causing him pain by the two Broward Deputy Sheriffs, Deputy Kevin Abrams and Deputy Brian O'Donoghue, who arrived on the scene pursuant to Deputy DeGiovanni's request for assistance, are not relevant for our analysis.  Stephens avers he "was already handcuffed" when Deputy Abrams "walked over near where [he] was standing." Stephens's Second Aff. at 2 ¶ 5.  Deputy Abrams did not assist Deputy DeGiovanni in

observe me driving or operating my girlfriend's car." The other Broward Deputy Sheriffs searched and towed away the car on which Stephens had been working, although it did not belong to him.

Deputy DeGiovanni drove Stephens to the police station, where he was denied the use of a bathroom. In Stephens's presence, Deputy DeGiovanni prepared a report of the incident. After reviewing the report, another deputy told Deputy DeGiovanni: "That report's not gonna stick." Deputy DeGiovanni rewrote his event report for the Broward Sheriff's Office:

> On 02/16/09 at 2015 hrs. I was conducting preventative patrol/business checks at 4061 NW 34th St. Lauderdale Lakes FL.
>
> During my patrol I observed a 97' Grey Toyota Camry bearing FL Tag #<U54-0RT> parked in front of closed businesses with the vehicle running. Additionally, the space the driver parked his vehicle in was marked with a posted sign which read "Retail Parking Only". Alert to the recent burglaries in the area, I approached the vehicle and asked the driver if he had any business being parked in front of the mentioned closed establishments. He stated that he lived in the nearby residential area. I asked the driver to provide me with a form of identification to verify that he lived there. The driver refused. I made several additional requests, but the driver still refused. The driver then stepped out of the vehicle in an aggressive manner, without my request or permission. *At this time, I placed him under*

---

handcuffing Stephens. *Id.* ¶ 6. Stephens "was already in the backseat of [Deputy] DeGiovanni's police car when" Deputy O'Donoghue "arrived on the scene." *Id.* ¶ 9. Similarly, Deputy O'Donoghue states, when he arrived on the scene, Stephens "was already in custody and in the back of a marked patrol car," which means he did not witness the relevant force used by Deputy DeGiovanni in arresting Stephens. Brian O'Donoghue's Decl. at 1 ¶ 3. Stephens avers he "did not speak" with Deputy Abrams or Deputy O'Donoghue "on February 16, 2009." Stephens's Second Aff. at 2 ¶ 10. To the extent the unsworn declarations of these deputies differ with Stephens's affidavits and his account of his encounter with Deputy DeGiovanni, we have to accept Stephens's version on summary-judgment review.

*arrest for obstructing my investigation.* Search incident to the arrest revealed a FL ID Card which showed the driver lived at 7221 NW 54th Ct. Lauderhill, FL. and was issued on 05/03/2005. *I then confirmed through teletype that the driver has never been issued, or possessed in the past, a valid driver's license. The suspect was charged accordingly.*

The vehicle was towed by West Way.

*The suspect was transported to BSO Main Jail.*

Deputy DeGiovanni's Event Rpt. at 3 (Feb. 17, 2009, 5:14:51 AM) (emphasis added).

Deputy DeGiovanni charged Stephens under Fla. Stat. § 843.02, resisting an officer without violence to his or her person,[5] and Fla. Stat. § 322.03(1), requiring Florida drivers to be licensed.[6] After waiting half an hour to forty-five minutes at the Broward Sheriff's Office jail, the jail staff refused to book Stephens, because of his injuries. Deputy DeGiovanni took Stephens to Broward General Medical Center, where he remained for several hours. He then transported Stephens to the

---

[5] Section 843.02 provides "[w]hoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a *misdemeanor of the first degree*." Fla. Stat. § 843.02 (emphasis added). "[T]o support a conviction for obstruction without violence, the State must prove: (1) the officer was engaged in the lawful execution of a legal duty; and (2) the defendant's action, by his words, conduct, or a combination thereof, constituted obstruction or resistance of that lawful duty." *C.E.L. v. State*, 24 So. 3d 1181, 1185-86 (Fla. 2009).

[6] "Except as otherwise authorized in this chapter, a person may not drive any motor vehicle upon a highway in this state unless such person has a valid driver license issued under this chapter." Fla. Stat. § 322.03(1). We note Florida law provides "[a] nonresident who is at least 18 years of age and *who has in his or her immediate possession a valid noncommercial driver license issued to the nonresident in his or her home state or country operating a motor vehicle, other than a commercial motor vehicle, [is exempt from obtaining a driver license] in this state*." Fla. Stat. § 322.04(1)(d) (emphasis added).

8

Broward County Jail, where he remained for several hours until he was able to pay his $100 bond the following morning.

In his affidavit, Stephens describes his injuries resulting from his encounter with Deputy DeGiovanni that continue to cause him pain:

> [A]s a result of Deputy DeGiovanni shoving me the third time, *causing me to strike the back of my head and neck on the car*, and *twisting my hand* the way he did, *forcing the last three fingers on my right hand backwards toward my forearm and causing all of my body weight to be placed on those three fingers*, and *leaving me handcuffed for almost three hours in handcuffs that were too tight, I experienced physical injuries, pain and suffering including, among other things headaches, back pain, and loss of sensation in my right hand. The injuries, pain and suffering are continuing and ongoing*.

Stephens's Aff. at 5 ¶ 13 (emphasis added). Dr. Barry Schapiro, an orthopedic physician, examined Stephens and reviewed his medical records resulting from the February 16, 2009, incident. In his September 26, 2014, report, Dr. Schapiro diagnosed Stephens with

> a cervical sprain/strain with multilevel disc herniations and resultant foraminal stenosis as a result of the described assault on February 16, 2009. The patient also sustained a left shoulder partial thickness articular-sided rotator cuff tear involving the infraspinatus tendon. He also sustained a sprain of the right wrist. Further electrodiagnostic workup is required to evaluate the radiating pain and little finger numbness to differentiate cervical radiculitis/radiculopathy and a peripheral nerve injury in the right upper extremity.
> . . . .
> The injuries sustained are causally related to the injury of February 16, 2009. . . .
> . . . .
> The claimant's treatment was medically necessary and reasonable as it relates to his traumatic injury of February 16, 2009.

9

. . . .

The claimant's diagnostic workup was medically necessary and reasonable as it relates to his traumatic injury of February 16, 2009.

. . . .

I would recommend an electromyography and nerve conduction study of the right upper extremity.  I believe this additional study to be reasonable, related, and necessary.

. . . .

Additional care, as it relates to the traumatic injury of February 16, 2009, is indicated.  The patient may require arthroscopic rotator cuff debridement or repair due to his persistent and refractory left shoulder pain.  He may require cervical epidural steroid injections or cervical disc decompression depending on the result of his electrodiagnostic studies.

Barry Schapiro, M.D., Report on Paul Stephens at 8 (Sept. 26, 2014) (regarding injuries sustained on Feb. 16, 2009).[7]

In his amended pro se complaint for his § 1983 action in the Southern District of Florida, Stephens describes his injuries and the consequences to him, all of which resulted from his encounter with Deputy DeGiovanni on February 16, 2009:

---

[7] Among the diagnostic tests performed on Stephens that Dr. Schapiro reviewed was a "cervical spine MRI obtained on January 30, 2010 . . . [that] revealed a disc bulge at C3-4, a left paracentral disc protrusion at C4-5 partially effacing the anterior subarachnoid space and narrowing the left intervertebral foramen, a C5-6 disc bulge, and a right paracentral disc protrusion at C6-7 abutting the right C7 nerve root and narrowing the right intervertebral foramen."  Barry Schapiro, M.D., Report on Paul Stephens at 2.  In addition, "[a]n MRI of the left shoulder dated April 18, 2010 . . . showed an articular-sided partial thickness tear of the infraspinatus tendon without evidence of a full-thickness tear."  *Id.* at 3.  Although Stephens said a bulge on his neck resulted from his encounter with Deputy DeGiovanni, Dr. Schapiro determined "[t]he left posterior neck lipoma is not likely related to the traumatic injury of February 16, 2009."  *Id.* at 8.  Stephens's other medical expert, Dr. Seong Lee, who surgically removed the lipoma, also concluded Stephens's lipoma was not the result of the February 16, 2009, incident.

10

(A) Severe permanent physical injury resulting in pain and suffering and requiring neck surgery, which was performed; the injury resulted in me having a swollen neck, cervical herniated and bulging dis[c]s, severe pain spreading from my shoulder blade to my neck, headaches, and pain and numbness in my right hand (causing problems because I am right-handed).  I also had to undergo extensive treatment and physical therapy;

(B) The injuries have prevented me from working, causing me to lose my job as an auto mechanic and causing me to continue to be unemployed;

(C) Monetary losses;

(D) Physical inconvenience and discomfort, loss of time, *emotional trauma, anxiety and distress, humiliation and embarrassment, and impairment to reputation*.

Am. Compl. at 5-6 ¶ 26 (emphasis added).

## B. Judicial Proceedings

### 1. State Court

Stephens retained an attorney to defend him on the Florida charges.  The State dismissed the resisting-an-officer-without-violence charge under Fla. Stat. § 843.02, a first-degree misdemeanor.  Stephens changed his original May 29, 2009, not-guilty plea for violating Fla. Stat. § 322.03(1), operating a vehicle without a driver's license, and pled nolo contendere on September 9, 2009, including waiving his rights regarding the first-degree misdemeanor.  *State v. Stephens*, No. 09004094MM10A, Fla. 17th Cir. Ct. (Sept. 9, 2009) (Broward Cty. Cir. Ct.).  Stephens explained why he accepted the plea bargain for being charged with violating Fla. Stat. § 322.03(1) requiring a driver's license, based on his attorney's advice:

11

> I accepted a plea deal with the State on the charge of Operating a Vehicle Without a Valid Driver's License, which was a plea of No Contest with a Withhold of Adjudication (no conviction) and a fine. *Though I was falsely charged with Operating a Vehicle Without a Valid Driver's License, I decided to accept that plea offer on the date set for trial, because I needed to go to Jamaica for the funeral of my cousin that was two days later*, as well as to assist another cousin in Jamaica with the funeral arrangements, and *my attorney advised me that if I did not take the plea offer, there would be no guarantee that I would be able to attend that funeral.*

Am. Compl. at 5 ¶ 23 (emphasis added).[8]

Stephens moved to vacate his conviction under Fla. Stat. § 322.03(1) on November 5, 2014. His second and appellate attorney filed an Amended Motion to Vacate Judgment of Conviction under Florida Rule of Criminal Procedure 3.850 on November 6, 2014, because:

> The facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence, and the claim is made within 2 years of the time the new facts were or could have been discovered with the exercise of due diligence;
> STEPHENS' plea was involuntary; and

---

[8] In his motion for reconsideration of the summary judgment order, Stephens's second and appellate attorney further explains his decision to plead nolo contendere:

> STEPHENS accepted the plea of no contest with a withhold [of] adjudication as to the driving a motor vehicle without a driver's license, *even though both he and DEGIOVANNI agree that STEPHENS was not driving the vehicle*, because he believed that violating Florida Statutes § 322.03 was an offense that, if convicted, could require him to serve jail time. *That was why STEPHENS was concerned about not being able to attend the funeral in Jamaica if he did not accept the plea and was subsequently found guilty.*

Stephens's Mot. for Reconsideration of Summ. J. Order at 2 ¶ 3 (emphasis added).

Ineffective assistance of counsel for not deposing the arresting officer, not interviewing the eyewitnesses and allowing Defendant to plead to the charges for which he was not guilty.

Stephens's Am. Mot. to Vacate J. of Conviction at 1, *State v. Stephens*, No. 09004094MM10A, Fla. 17th Cir. Ct. (Nov. 6, 2014).[9] In her December 1, 2014, order denying Stephens's motion to vacate his previous judgment and conviction, the Broward County judge explained his motion was time barred under Florida Rule of Criminal Procedure 3.850.[10]

---

[9] Regarding ineffective assistance by Stephens's first attorney, his second attorney noted Fla. Stat. § 322.03(1) requires a perpetrator to have been *driving* a vehicle; *Stephens never drove the car on which he was working*. Stephens's Am. Mot. to Vacate J. of Conviction at 4 ¶ 11; *see* Fla. Stat. § 316.003(46) ("**Operator**" means "[a]ny person who is *in actual physical control of a motor vehicle upon the highway* or who is exercising control over or steering a vehicle being towed by a motor vehicle." (emphasis added)); Fla. Stat. § 322.01(16) ("'Drive' means to operate or be in actual physical control of a motor vehicle in any place open to the general public for purposes of vehicular traffic."). Stephens's first attorney never interviewed Greenwood and White's three children, all of whom had witnessed his entire incident with Deputy DeGiovanni and could have testified Stephens did not drive the car. Stephens's Am. Mot. to Vacate J. of Conviction at 2 ¶ 6. Stephens's first attorney also did not depose Deputy DeGiovanni, who would have testified he did not see Stephens drive the car. *Id.* at 3 ¶ 8. That attorney had informed Stephens the only repercussions of his nolo contendere plea would be paying a fine of approximately $275. *Id.* ¶ 7. *Significantly, Stephens's first attorney failed to inform him his pleading nolo contendere to the State's plea bargain was a conviction under Fla. Stat. § 960.291(3). Id.* at 5 ¶ 13.

[10] No motion to vacate a sentence "shall be filed or considered pursuant to this rule if filed more than 2 years after the judgment and sentence become final." Fla. R. Crim. P. 3.850(b). This rule provides an exception, if "the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence, and the claim is made within 2 years of the time the new facts were or could have been discovered with the exercise of due diligence." Fla. R. Crim. P. 3.850(b)(1). The exception is inapplicable in this case, because the eyewitnesses' knowledge of Stephens's arrest, on which the motion to vacate Stephens's sentence relies, was known to Stephens, Greenwood, and White's observing children, who could have been discovered with the exercise of due diligence by his original attorney before the expiration of two years.

13

## 2. Federal Court

Stephens filed two pro se complaints in the Southern District of Florida. While his operative, amended complaint states six causes of action, only two are raised on appeal: false arrest and excessive force.[11] Deputy DeGiovanni pled qualified immunity as an affirmative defense for his actions in encountering and arresting Stephens. The relief Stephens sought consisted of compensatory and punitive damages, costs of his litigation, and attorney's fees; he also requested a jury trial. The district judge granted summary judgment to Deputy DeGiovanni on Stephens's unlawful-seizure or false-arrest claim, since Stephens's nolo contendere plea to the misdemeanor of driving without a license was conclusive proof of probable cause, defeating Stephens's contention of lack of probable cause for his arrest. The judge also granted summary judgment and accorded qualified immunity to Deputy DeGiovanni on Stephens's claim of excessive force in his arrest, because she concluded the force Deputy DeGiovanni used in the arrest was de minimis. The judge denied Stephens's motion for reconsideration. We address

---

[11] The causes of action in Stephens's amended pro se complaint are: Count I, Florida assault and battery against the Broward Sheriff's Office; Count II, excessive force under 42 U.S.C. § 1983 against Deputy DeGiovanni; Count III, unlawful seizure (arrest) under 42 U.S.C. § 1983 against Deputy DeGiovanni; Count IV, equal protection violation under 42 U.S.C. § 1983 against Deputy DeGiovanni; Count V, violation of 42 U.S.C. § 1981 (racial discrimination) against Deputy DeGiovanni; and Count VI, Florida assault and battery against Deputy DeGiovanni. Stephens also requested attorney's fees under 42 U.S.C. § 1988, if he obtained an attorney and prevailed.

14

the false-arrest and excessive-force claims Stephens timely raised on interlocutory appeal.

## II. ANALYSIS

We review de novo a grant of summary judgment based on qualified immunity and "apply the same legal standards as the district court." *Draper v. Reynolds*, 369 F.3d 1270, 1274 (11th Cir. 2004). "We resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003); *see Tolan v. Cotton*, __ U.S. __, 134 S. Ct. 1861, 1863 (2014) ("[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986)) (second alteration in original)). "With the facts so construed, we have the plaintiff's best case"; "therefore, material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity." *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008) (citation and internal quotation marks omitted).

15

## A. Qualified Immunity

"Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). "A successful section 1983 action requires that the plaintiff show [he] was deprived of a federal right by a person acting under color of state law." *Almand v. DeKalb Cty.,* 103 F.3d 1510, 1513 (11th Cir. 1997). "A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). From the outset of its qualified-immunity jurisprudence, the Supreme Court has instructed "government officials performing discretionary functions" must "not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982), meaning, on the facts alleged, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001). Since there is no dispute the government official, Deputy DeGiovanni, was "acting within the scope of his discretionary authority" in his road patrol of Lauderdale Lakes when he encountered and arrested Stephens, the burden shifts to Stephens "to show that qualified immunity

16

is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation and internal quotation marks omitted).

"Because qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *Id.* (citation and internal quotation marks omitted). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan*, __ U.S. at __, 134 S. Ct. at 1865. "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right. . . . The second . . . asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at __, 134 S. Ct. at 1865-66 (citations, internal quotation marks, and alterations omitted) (first ellipsis in original). We have discretion to decide which question to address first. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009). In this case, both issues on appeal, false arrest and excessive force in the arrest, common concerns in arrest situations, are based on the Fourth Amendment.[12]

---

[12] The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Fourth Amendment rights were extended to protect against state action by the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691 (1961).

"In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's 'objective reasonableness' standard." *Hadley*, 526 F.3d at 1329 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 197, 125 S. Ct. 596, 598 (2004)). Because the objective-reasonableness test applies to Fourth Amendment, qualified-immunity analysis, courts do not speculate as to what government officials subjectively thought but assess their actions for objective reasonableness under established constitutional law.[13] *See Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738. "At summary judgment, we cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011). "[T]he question we ask is whether, under [the plaintiff's] version of the facts, [the officer] behaved reasonably in the light of the circumstances before him." *Galvez v. Bruce*, 552 F.3d 1238, 1243 (11th Cir. 2008) (citation and internal quotation marks omitted). The excessive-force "area is one in which the result depends very much on the facts of each case." *Brosseau*, 543 U.S. at 201, 125 S. Ct. at 600.

---

[13] While Deputy DeGiovanni made comments in his encounter with Stephens and Greenwood that could be interpreted to express racial motivation for his conduct toward Stephens, reviewing courts consider only the objective reasonableness of his conduct toward Stephens under the facts of the investigation he was conducting for Fourth Amendment analysis. In addition, Stephens did not challenge on appeal the count addressing a racial statutory basis in his amended pro se complaint.

Excessive-force claims are fact-specific; whether the force an officer uses is *reasonable* "requires careful attention to the facts and circumstances of each particular case."  *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989).

In an excessive-force case, where qualified immunity has been pled, "[o]ur circuit uses two methods to determine whether a reasonable officer would know that his conduct is unconstitutional" under the Fourth Amendment.  *Fils*, 647 F.3d at 1291.  The first considers "the relevant case law at the time of the violation; the right is clearly established if a concrete factual context exists so as to make it obvious to a reasonable government actor that his actions violate federal law."  *Id.* (citation, internal quotation marks, and alteration omitted).  "This method does not require that the case law be 'materially similar' to the officer's conduct;" "[b]ut, where the law is stated in broad propositions, 'a very high degree of prior factual particularity may be necessary.'"  *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 740-41, 122 S. Ct. 2508, 2516 (2002)).

The second method looks "not at case law, but at the *officer's conduct*, and inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, *notwithstanding the lack of fact-specific case law*.'"  *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002)) (alteration omitted)

19

(emphasis added). The cases fitting this method are known as "obvious clarity," *id.* (quoting *Vinyard*, 311 F.3d at 1355), "a 'narrow exception' to the normal rule that only case law and specific factual scenarios can clearly establish a violation," *id.* (quoting *Lee*, 284 F.3d at 1198-99).

## 1. Recognizing Clearly Established Law

The affirmative defense of qualified immunity is founded on the presumption government officials know and respect "basic, unquestioned constitutional rights," measured by clearly established law. *Harlow*, 457 U.S. at 815, 102 S. Ct. at 2737 (citation and internal quotation marks omitted).

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful*; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Hope*, 536 U.S. at 739, 122 S. Ct. at 2515 (citations and internal quotation marks omitted) (emphasis added). The *Hope* Court cautioned courts determining clearly established law should not rely on prior cases merely because of "fundamentally similar" or "materially similar" facts. *Id.* at 741, 122 S. Ct. at 2516 (citation and internal quotation marks omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* Instead, the focus should be on whether the law on the date of the excessive conduct in question gave the implicated officials "fair warning that their alleged treatment of

20

[the plaintiff] was unconstitutional." *Id.* The basic constitutional law governing excessive force in arrest situations was well established before Stephens's arrest in February 2009.[14] Qualified immunity is unavailable "if an official *knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Harlow*, 457 U.S. at 815, 102 S. Ct. at 2737 (citation, internal quotation marks, and alteration omitted); *see Sheth v. Webster*, 145 F.3d 1231, 1235-36 (11th Cir. 1998) (affirming denial of qualified immunity, "because of the absence of any justification for [the officer's] use of force, application of the Fourth Amendment reasonableness standard would inevitably lead every reasonable officer . . . to conclude that the force was unlawful" (citation and internal quotation marks omitted) (ellipsis in original)).

## 2. Identifying Obvious-Clarity Cases

The *Hope* Court explained "a general constitutional rule already identified in the decisional law may apply with *obvious clarity* to the specific conduct in question, *even though the very action in question has not previously been held unlawful.*" 536 U.S. at 741, 122 S. Ct. at 2516 (citation, internal quotation marks, and alteration omitted) (emphasis added). "Concrete facts are generally necessary

---

[14] "In this circuit, the law can be clearly established for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Lee*, 284 F.3d at 1197 n.5 (citation and internal quotation marks omitted). In this case, the highest state court is the Florida Supreme Court.

to provide an officer with notice of the 'hazy border between excessive and acceptable force.'" *Fils*, 647 F.3d at 1291 (quoting *Lee*, 284 F.3d at 1198-99). "But, *where the officer's conduct is so outrageous that it clearly goes 'so far beyond' these borders, qualified immunity will not protect him even in the absence of case law.*"  *Id.* at 1291-92 (quoting *Reese v. Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008)) (emphasis added).

> [I]n the absence of fact-specific case law, the plaintiff may overcome the qualified immunity defense when the preexisting general constitutional rule applies "with obvious clarity to the specific conduct in question," and it must have been "obvious" to a reasonable police officer that the pertinent conduct given the circumstances must have been unconstitutional at the time.

*Vinyard*, 311 F.3d at 1352 (quoting *Hope*, 536 U.S. at 741, 122 S. Ct. at 2516).

In considering an excessive-force case, a court should determine whether an officer's conduct in making an arrest is objectively reasonable or if it is an over-reactive, disproportionate action for the situation relative to the response of the apprehended person.  The latter is the sort of unconstitutional conduct that deprives an officer of qualified-immunity protection in an obvious-clarity case.  Under the plaintiff's version of the alleged excessive-force occurrence, an obvious-clarity case is presented, when "no factually particularized, preexisting case law [i]s necessary for it to be very obvious to every objectively reasonable officer" confronting the same situation that the officer's conduct "violated [the plaintiff's] constitutional right to be free of the excessive use of force," precluding qualified-

22

immunity protection. *Id.* at 1355[15]; *see Slicker v. Jackson*, 215 F.3d 1225, 1232 (11th Cir. 2000) ("[I]n an excessive force case, qualified immunity applies *unless application of the standard would inevitably lead every reasonable officer to conclude the force was unlawful.*" (citation, internal quotation marks, and ellipsis omitted) (emphasis added)).

"A genuine 'excessive force' claim relates to the *manner in which an arrest was carried out*, independent of whether law enforcement had the power to arrest."

---

[15] The conduct of officers toward individuals over whom they had control shows why they were determined to be obvious-clarity cases in the Supreme Court and our court. In *Hope*, an Alabama prisoner, who had napped en route to a chain-gang worksite and had gotten into an altercation with a guard who had awakened him, was placed in leg irons and returned to the prison, where he was handcuffed to a hitching post with his arms above his head for seven hours. 536 U.S. at 734-35, 122 S. Ct. at 2512-13. During this time, his shirt was removed, resulting in his skin being burned in the hot summer sun; he had little water, no bathroom breaks, and was taunted by guards. *Id.* The *Hope* Court readily concluded from the facts "the Eighth Amendment violation is obvious." *Id.* at 738, 122 S. Ct. at 2514. The prison guards were not entitled to qualified immunity.

In *Lee*, a black woman was pulled over by a white police officer for honking her horn at a car that was not proceeding in front of her in heavy traffic. 284 F.3d at 1190. Before the woman could reach for her bag to produce her driver's license requested by the officer, he pulled her door open, took out his night stick, put it in her face, and made derogatory racial comments to her. *Id.* at 1191. The officer grabbed her left wrist, pulled her out of her car, shoved her hand against her back, and announced she was under arrest. *Id.* He then threw her hand on top of the hood of her car, frisked her, and went through her pockets. *Id.* After placing her in handcuffs, the officer took her to the trunk of her car, slammed her head onto the trunk, and spread her legs with his foot. *Id.* At no time during the incident did the woman resist. "On her arrest form, Lee was charged with battery on a police officer, failure to have a valid driver's license, resisting arrest with violence, and failure to obey a police officer." *Id.* at 1192. Additionally, she received a traffic citation for improper use of her car horn. *Id.* Analyzing the excessive-force claim, our court concluded the officer's force was excessive and disproportionate, which precluded him from qualified immunity on Lee's excessive-force claim. *Id.* at 1198, 1200. We noted slamming Lee's head against the trunk of her car was "objectively unreasonable and clearly unlawful. This conclusion seems to us to be even more self-evident where . . . the crime involved nothing more than the improper use of a horn on a busy thoroughfare during rush hour traffic in a large metropolitan community." *Id.* at 1200.

23

*Hadley*, 526 F.3d at 1329 (citing *Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1332 (11th Cir. 2006)) (emphasis added). Courts must examine "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily [or psychological] harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 383, 127 S. Ct. 1769, 1778 (2007)). Consequently, "the words of a federal statute or federal constitutional provision may be *so clear* and the conduct *so bad* that *case law is not needed to establish that the conduct cannot be lawful*." *Vinyard*, 311 F.3d at 1350 (emphasis added). In an obvious-clarity case, where the officer's conduct is plainly objectively unreasonable, a court does not need prior case law to determine the force used by the officer was excessive and unlawful, because it was disproportionate.

**B. False Arrest**

Count III of Stephens's amended pro se complaint concerns his alleged unlawful seizure.[16] "[A] person has been 'seized' . . . only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554,

_____

[16] "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citation and internal quotation marks omitted).

100 S. Ct. 1870, 1877 (1980); *see Brendlin v. California*, 551 U.S. 249, 254, 127 S. Ct. 2400, 2405 (2007) (noting a seizure occurs under the Fourth Amendment "when the officer, by means of physical force or show of authority, terminates or restrains [a person's] freedom of movement, *through means intentionally applied*" (citations and internal quotation marks omitted)); *Michigan v. Summers*, 452 U.S. 692, 696 n.5, 101 S. Ct. 2587, 2591 n.5 (1981) ("'It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.'" (quoting *Terry v. Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877 (1968))).[17]  "'Under the Fourth Amendment, an individual has a right to be free from "unreasonable searches and seizures" . . . . [and] an arrest is a seizure of the person.'"  *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007)) (alteration and ellipsis in original).  By the summary-judgment stage, Stephens had converted his unlawful-seizure claim into one for false arrest, as the district judge

---

[17] Following *Terry*, the Supreme Court has recognized certain other limited detentions as constitutional seizures without probable cause.  *See United States v. Place*, 462 U.S. 696, 703, 103 S. Ct. 2637, 2642 (1983) ("The exception to the probable-cause requirement for limited seizures of the person recognized in *Terry* and its progeny rests on a balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of the Fourth Amendment's general proscription against unreasonable searches and seizures." (citation and internal quotation marks omitted)).  "When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause."  *Id.*

recognized.[18]   In district court and on appeal, Stephens has argued Deputy

DeGiovanni did not have probable cause to arrest him.

Under the Full Faith and Credit Clause of the Constitution, U.S. Const. art.

IV, § 1, implemented by 28 U.S.C. § 1738,[19] "[i]t is now settled that a federal court

must give to a state-court judgment the same preclusive effect as would be given

that judgment under the law of the State in which the judgment was rendered."

*Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S. Ct. 892, 896

(1984); *see Barts v. Joyner*, 865 F.2d 1187, 1194 n.5 (11th Cir. 1989)

(acknowledging under *Migra*, "state court judgment must be given [the] same

preclusive effect in section 1983 suits in federal court as would be given in courts

of issuing state").   Under Florida law, "'Conviction' means a guilty verdict by a

jury or judge, *or a guilty or nolo contendere plea by a defendant*, regardless of

adjudication of guilt."   Fla. Stat. § 960.291(3) (emphasis added); *see* Fla. Stat. §

---

[18] In her summary judgment order, the district judge quoted Stephens's response to Deputy DeGiovanni's summary judgment motion: "'Under the Fourth Amendment, STEPHENS had a right to be free from unreasonable searches and seizures, and *Deputy DeGiovanni's arrest of Stephens constituted a seizure of STEPHENS*.'"   Order Granting Def.'s Mot. for Summ. J. at 16 (quoting Stephens's Resp. to Deputy DeGiovanni's Summ. J. Mot. at 6) (emphasis added).

[19] "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.  And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."   U.S. Const. art. IV, § 1.

"Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."   28 U.S.C. § 1738.

26

921.0021(2) ("'Conviction' means a determination of guilt that is the result of a plea or a trial, regardless of whether adjudication is withheld.").

The Florida Supreme Court has held "a judgment of conviction . . . is a sufficient legal determination of the existence of probable cause . . . [unless] it be shown that the judgment was obtained by fraud, perjury, or other corrupt means." *Goldstein v. Sabella*, 88 So. 2d 910, 911-12 (Fla. 1956); *see Behm v. Campbell*, 925 So. 2d 1070, 1072 (Fla. Dist. Ct. App. 2006) ("A judgment of conviction is conclusive evidence of probable cause, unless the judgment was obtained by fraud, perjury, or other corrupt means."). More recently, the Florida Supreme Court reiterated "[w]e have long held that a guilty plea must be made 'without a semblance of coercion, and without fear or duress of any kind.'" *Farr v. State*, 124 So. 3d 766, 779 (Fla. 2012) (quoting *Nickels v. State*, 99 So. 121, 121 (Fla. 1924)). The "threat or coercion is not required to originate from law enforcement or a state actor for the abuse to form the basis of an involuntary plea claim." *Id.*

Stephens admits he pled nolo contendere to the offense of his arrest, Fla. Stat. § 322.03(1), driving without a valid driver's license, so he could travel to Jamaica in time to attend his cousin's funeral. This was his decision with counsel; Stephens has not shown the prosecuting authority engaged in any improper conduct. Under *Goldstein*, the *conviction judgment* must have been obtained by fraud, perjury, or corrupt means, *not the arrest*. Stephens has presented no

27

evidence he was coerced into pleading nolo contendere by any corrupt means or shown his plea otherwise was defective. Consequently, Stephens has averred no facts to show the Florida court acted with "fraud, perjury, or other corrupt means" in accepting his plea and rendering his conviction judgment. *Goldstein*, 88 So. 2d at 911-12. With Stephens's nolo contendere plea establishing probable cause for his arrest, his conviction stands under Florida law, which we must accept.[20] The district judge correctly granted summary judgment to Deputy DeGiovanni on Stephens's false-arrest claim.

## C. Excessive Force

"It is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." *Davis v. Williams*, 451 F.3d 759, 767 (11th Cir. 2006) (citing cases). "In order for there to be a violation

---

[20] Stephens's plea of nolo contendere to Fla. Stat. § 322.03(1) and his delay beyond the statutory period for withdrawing his plea foreclose our analysis of constitutional probable cause, which would have been different had he not pled no contest. "Probable cause to arrest exists '*when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information*, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Draper*, 369 F.3d at 1276 (quoting *Durruthy*, 351 F.3d at 1088) (emphasis added). The facts known by Deputy DeGiovanni during his encounter with Stephens and Greenwood, especially their having the key to Claudia White's apartment, should have confirmed their explanation of being on the premises of the Shoppes of St. Croix as invitees so Stephens could check the engine of the car belonging to his girlfriend that White was considering buying. This apparent and verified explanation should have dispelled Deputy DeGiovanni's stated reason for his investigatory stop: to determine if Stephens and Greenwood were engaged in burglary. Without probable cause, Stephens would have had a viable cause of action to pursue in his § 1983 case. But "[t]he existence of probable cause at the time of arrest . . . constitutes an absolute bar to a section 1983 action for false arrest." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004). Stephens provided probable cause for his arrest by his nolo contendere plea, which defeated the false-arrest cause of action in his § 1983 case.

of the Fourth Amendment because of the use of excessive force, it must have been applied *during the course of the seizure and not at some other time*." *West v. Davis*, 767 F.3d 1063, 1070 (11th Cir. 2014) (emphasis added). Allegations of excessive force during an arrest can occur in a wide range of conduct by government officials in their efforts in stopping apparent criminal activity, such as shooting or fighting, to investigating a potential crime or misdemeanor.[21] This case occurs at the far or lowest misdemeanor side of the spectrum, alleged driving without a driver's license. *See Galvez*, 552 F.3d at 1241 (denying qualified immunity to deputy sheriff for his disproportionate use of excessive force when arresting plaintiff for "petit theft of [a] driver's license and resisting arrest without violence, both misdemeanors" in Florida).

### 1. Determining Excessive Force

When "the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham*, 490 U.S. at 394, 109 S. Ct. at 1871. "[T]he right to make an arrest or investigatory stop necessarily

---

[21] A custodial arrest may be made for misdemeanor offenses and traffic violations. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557 (2001). "[U]nder Florida law, like under federal law, a full custodial arrest is allowed even when the offense is only a misdemeanor. *See* Fla. Stat. § 901.15(1) ('A law enforcement officer may arrest a person without a warrant when . . . [t]he person has committed a felony or misdemeanor . . . in the presence of an officer.')." *Durruthy*, 351 F.3d at 1093 (second alteration and ellipses in original). Violating Fla. Stat. § 322.03(1), driving without a valid driver's license, is a second-degree misdemeanor, Fla. Stat. § 322.39, punishable by up to 60 days in jail, Fla. Stat. § 775.082(4)(b).

carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396, 109 S. Ct. at 1872. An officer's use of force, however, violates the Fourth Amendment when it is *objectively unreasonable* under the facts and circumstances of a specific case, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Determining whether the force used to effect a seizure was objectively reasonable requires case-by-case "balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.*, 109 S. Ct. at 1871 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 1699 (1985)).

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force *in the course of an arrest*." *Lee*, 284 F.3d at 1197 (emphasis added). The *Graham* objective-reasonableness standard governs judicial determination of claims of official use of excessive force. "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Id.* (citation and internal quotation marks omitted). In deciding whether an officer is entitled to summary judgment based on qualified immunity, the question of whether the force used by the officer in the course of an arrest is excessive is a "'pure question of

30

law,'" decided by the court. *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (quoting *Scott*, 550 U.S. at 381 n.8, 127 S. Ct. at 1776 n.8).

To determine "whether the force used to effect a particular seizure is 'reasonable,'" the *Graham* Court noted three nonexclusive factors for evaluating an officer's necessity for using force against an arrestee's Fourth Amendment rights: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."[22] 490 U.S. at 396, 109 S. Ct. at 1871-72. Regarding the first *Graham* factor, severity of the crime, the conduct with which Stephens was charged at the scene, obstructing Deputy DeGiovanni's investigation without violence and driving without a driver's license, are misdemeanors, the first of which was dismissed by the State.[23] The investigation of neither of these misdemeanors rises to the level of criminal conduct that should have required the use of force.

---

[22] In *Graham*, the Court recognized "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." 490 U.S. at 396, 109 S. Ct. at 1872 (citation, internal quotation marks, and alteration omitted); *see Brosseau*, 543 U.S. at 199, 125 S. Ct. at 599 ("*Graham* and *Garner*, following the lead of the Fourth Amendment's text, are cast at a high level of generality.").

[23] We have noted "'[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest.'" *Durruthy*, 351 F.3d at 1089 n.6 (quoting *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty.*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992)).

Accepting Stephens and Greenwood's affidavits as we must, it also is clear Stephens posed no threat to the safety of Deputy DeGiovanni or the other two deputies, the latter of whom arrived at the scene after Stephens had been arrested and handcuffed.[24]  The only threatening language and forceful, physical conduct, which injured Stephens, came from Deputy DeGiovanni.  Stephens complied with each investigation request by Deputy DeGiovanni, including producing his identification, which necessitated his standing up from his seated position on the driver's door frame of the car, where he was checking the engine, to retrieve his Florida identification card from his back pocket.  Deputy DeGiovanni did not request specifically a Florida driver's license from Stephens.

There is no evidence Stephens did anything to cause Deputy DeGiovanni to slap the Bluetooth device out of his ear, which prompted Stephens to request Deputy DeGiovanni to call his supervisor to the scene.[25]  Using his full body

---

[24] In his affidavit, Stephens averred: "At no time did I raise my voice at Deputy DeGiovanni.  At no time did I say anything threatening to Deputy DeGiovanni. At no time did [I] make any[] threatening gestures towards Deputy DeGiovanni."  Stephens's Aff. at 4 ¶ 11.  Similarly, eyewitness Greenwood attested: "At no time did Paul Stephens raise his voice at Deputy DeGiovanni.  At no time did Paul Stephens say anything threatening to Deputy DeGiovanni.  At no time did Paul Stephens make any[] threatening gestures towards Deputy DeGiovanni."  Greenwood's Aff. at 3 ¶ 9.

[25] "[A] citizen [cannot] be precluded by the threat of arrest from asking to speak to an officer's superior or from asking for an officer's badge number.  Those inquiries . . . do not constitute obstruction of justice or disorderly conduct."  Davis, 451 F.3d at 767 (emphasis added).  In West, an attorney arriving at a county courthouse for a case, was detained by a security officer at the entry screening, because she would not remove her suit jacket, which would have exposed her undergarments; she asked him to call his supervisor.  767 F.3d at 1066.  When the supervisor arrived, he told the attorney she did not have to remove her suit jacket; wanding her was

weight, Deputy DeGiovanni thereafter twice slugged Stephens in his chest, each time slamming him into the car-driver's seat. Stephens alleges, when he noted White's children were watching his abusive conduct, Deputy DeGiovanni responded by stepping on Stephens's foot as he slammed him the third time forcefully back into the car, which resulted in Stephens's being thrown against the car-door frame, causing severe injuries to his neck, back, and shoulder.[26] As

---

sufficient. *Id.* On the way out of his clinic, the plaintiff doctor in *Galvez* "was simply asking [the officer] why [the officer] was arresting him and why [the officer] was humiliating him and informing [the officer] that he knew [his] boss." 552 F.3d at 1243. Thereupon, the officer "forcefully 'dragged' [plaintiff] outside and proceeded to repeatedly 'slam' [plaintiff's] body into the corner of a concrete structure, causing [plaintiff] extreme pain, putting [plaintiff] in fear for his life, and inflicting serious injuries." *Id.*

[26] In according qualified immunity to Deputy DeGiovanni, the district judge noted Stephens's standing after Deputy DeGiovanni "pushed him down" into the driver's seat "could be interpreted as a prelude to resistance," which may have caused Deputy DeGiovanni to feel "threatened." Order Granting Def.'s Mot. for Summ. J. at 15, 16. Stephens had been sitting in the driver's seat with his feet on the ground, while he was checking the car engine with a scanner, when Deputy DeGiovanni encountered him. The first time Stephens stood up was to obtain his identification, which Deputy DeGiovanni had requested. Because his Florida identification card was in his back pocket, Stephens had to stand up to retrieve it, likely from his wallet in his back pocket. After slapping the Bluetooth device from Stephens's ear, causing him to request a field supervisor, Deputy DeGiovanni, using his full body weight, hit Stephens hard in the chest and slammed him down into the driver's seat. At that point, likely with the air knocked out of his lungs from being struck so forcefully in his chest, Stephens stood up and asked why Deputy DeGiovanni was doing that to him, causing Deputy DeGiovanni to slug him in his chest again and into the driver's seat. Stephens got up and said White's children were watching and asked what sort of example Deputy DeGiovanni was setting for them. Thereupon, Deputy DeGiovanni threw Stephens against the car-door jamb, causing his severe and permanent injuries. This third time, Stephens was too injured to stand up; instead, he had to pull himself up by the car-door frame. Accepting Stephens's version of the sequence of these events, there was nothing menacing about Stephens's getting up from the car driver's seat after Deputy DeGiovanni so roughly and aggressively had slammed him down into the car driver's seat by socking him in his chest twice rather than his remaining in a slumped or seated position.

   *Deputy DeGiovanni never asked Stephens to stay seated in the driver's seat.* While there is a rational and legitimate reason for Stephens to have stood up after having been knocked down aggressively by Deputy DeGiovanni, there is no logical explanation for Deputy DeGiovanni's

Stephens attempted to grasp the car door with his right hand to lift himself up, Deputy DeGiovanni grabbed and twisted his hand, so the palm faced up, then forced the last three fingers on Stephens's right hand backward toward his forearm, causing Stephens's full body weight to be supported on those three fingers of his right hand. This maneuver had nothing to do with Deputy DeGiovanni's placing handcuffs on nonresisting Stephens.

There is no evidence Stephens attempted to resist Deputy DeGiovanni's investigation ending in his arrest or to evade his arrest by fleeing. To the contrary, Stephens answered Deputy DeGiovanni's questions, despite Deputy DeGiovanni's harsh, threatening questioning and his forcefully hitting Stephens in his chest multiple times, ultimately causing his head to strike the door jamb, resulting in permanent injury as well as twisting Stephens's right hand and three fingers backward, supporting his full body weight. Through it all, Stephens was compliant, even when Deputy DeGiovanni arrested and handcuffed him. Stephens

slugging Stephens in his chest twice to throw him into the car-driver's seat. Deputy DeGiovanni's increased roughness, unprovoked by cooperative, nonaggressive Stephens, escalated to the third slamming of Stephens against the car-door jamb, after Stephens had noted White's children were watching Deputy DeGiovanni treating him so violently. There is no record evidence why Deputy DeGiovanni used such unwarranted force on compliant Stephens. Whether Stephens lived nearby the Shoppes of St. Croix was irrelevant, when Greenwood had shown and demonstrated to Deputy DeGiovanni they had the key to White's apartment for Stephens, an automobile mechanic, to check the car engine for her. The key verified Stephens's explanation to Deputy DeGiovanni regarding why he and Greenwood were at the Shoppes of St. Croix, and revealed they were not committing a burglary. Stephens, who freely had given his time and expertise to check the car engine, was left with debilitating injuries that ended his automobile-mechanic livelihood and sent him to the hospital and jail not to be released until the next morning, when he paid his $100 bond.

never attempted to flee the scene of his arrest.  Consequently, none of the *Graham* factors applies to Stephens's encounter with and seizure by Deputy DeGiovanni as to Stephens's actions resulting in his seizure and arrest by Deputy DeGiovanni. "[Q]ualified immunity is not appropriate when the *Graham* analysis yields an answer that is clear beyond all doubt," as in this case.  *Lee*, 284 F.3d at 1200.

### 2. Resulting Arrest Injuries

Because of the extent of the injuries he sustained during his arrest, Stephens contends on appeal, as in district court, Deputy DeGiovanni used excessive force in violation of the Fourth Amendment.  Based on Stephens and Greenwood's affidavits, there was no need for Deputy DeGiovanni to have used *any force* on Stephens, who had answered all of his questions, had produced his identification Deputy DeGiovanni had requested, and was not resisting or attempting to evade arrest.  Stephens had done nothing to give Deputy DeGiovanni cause to detain him until the next morning and to take him to jail, requiring Stephens to post a $100 bond to be released for misdemeanor charges.  "[A]n investigative detention must be . . . no longer than is necessary to effectuate the purpose of the stop."  *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325 (1983).

While "the typical arrest involves some force and injury," *Reese*, 527 F.3d at 1272 (citation and internal quotation marks omitted), the amount of force used by an officer in seizing and arresting a suspect "must be reasonably proportionate to

the need for that force," *Lee*, 284 F.3d at 1198.[27]  *See Jones v. Buchanan*, 325 F.3d

520, 528 (4th Cir. 2003) (recognizing a court considering an excessive-force case

should "view the evidence in full context, *with an eye toward the proportionality*

*of the force in light of all the circumstances*" (citation and internal quotation marks

omitted) (emphasis added)).  In applying the *Graham* objective-reasonableness

standard, our circuit has identified three factors to evaluate for determining if the

force used by an officer in making an arrest was objectively reasonable: "(1) the

need for the application of force, (2) the relationship between the need and amount

of force used, and (3) the extent of the injury inflicted."  *Vinyard*, 311 F.3d at 1347

(citing *Lee*, 284 F.3d at 1198; *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir.

1986)). [28]  While the first two of these factors were subsumed in our discussion of

the *Graham* factors, this case specifically requires us to focus on the physical

---

[27] "Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance.  However, *officers must assess not only the need for force, but also the relationship between the need and the amount of force used*.  Taking the facts in the light most favorable to plaintiffs, a jury could reasonably find that the *degree* of force the officers used in this case was not justifiable under the circumstances."  *Deville v. Marcantel*, 567 F.3d 156, 167-68 (5th Cir. 2009) (citations and internal quotation marks omitted) (first emphasis added).

[28] We have noted our former four-part test from *Leslie*, 786 F.2d at 1536, for assessing the need and amount of force, as well as resulting injuries, included a fourth subjective element, involving malicious application of force, which was "invalidated" following *Graham*.  *Nolin v. Isbell*, 207 F.3d 1253, 1257 n.3 (11th Cir. 2000); *Lee*, 284 F.3d at 1198 n.7.  "The other three elements of the *Leslie* test are still valid after *Graham*" and continue to be applied.  *Lee*, 284 F.3d at 1198 n.7.  We evaluate the reasonableness of the force used in an investigatory stop or arrest under the *Graham* objective-reasonableness test and determine whether an officer's actions were reasonable "in light of the facts and circumstances confronting [the officer], without regard to his underlying intent or motivation."  *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).

evidence of the force Deputy DeGiovanni used in arresting Stephens, measured by the extent of his injuries caused by Deputy DeGiovanni during Stephens's seizure and arrest.  In analyzing the injury factor, we distinguish the Fourth Amendment, excessive-force cognizable injuries suffered by Stephens resulting from the force Deputy DeGiovanni inflicted upon him from de minimis injuries.

Determining whether an injury occurring during an arrest resulted from excessive force by the officer depends on the particular circumstances of the arrest.[29]  When qualified immunity has been pled in a Fourth Amendment, excessive-force case, the review centers on whether the force used was objectively reasonable from the perspective of a reasonable officer on the scene.  *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872.  *The nature and extent of physical injuries sustained by a plaintiff are relevant in determining whether the amount and type of force used by the arresting officer were excessive.  See West*, 767 F.3d at 1066-67 (reversing summary judgment based on qualified immunity in a § 1983 case for courthouse security officer, who grabbed an entering attorney's cell phone she was holding to her ear, jerked her hand and arm from her face toward him while he "squeezed her hand and fingers hard and twisted her wrist back and forth, causing

---

[29] "[W]e do require a plaintiff asserting an excessive force claim to have suffered at least some form of injury. . . . In determining whether an injury caused by excessive force is more than de minimis, we look to the context in which that force was deployed.  The amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances."  *Williams v. Bramer*, 180 F.3d 699, 703-04 (5th Cir. 1999) (citations, internal quotation marks, and alteration omitted).

her severe pain," which resulted in her going to a hospital emergency room for "medication and a splint for her wrist," seeing "a hand specialist and [having] a carpal tunnel release procedure on the wrist that [the security officer] had grabbed and twisted"); *Saunders v. Duke*, 766 F.3d 1262, 1265-66 (11th Cir. 2014) (reversing dismissal of plaintiff's case on qualified immunity in a § 1983 case, where handcuffed arrestee, holding his face up to keep from being burned by the hot pavement on which he was lying, was slammed down by one of the officers "with extreme force," causing "lacerations, injuries to his teeth and jaw, damage to his left eardrum, and emotional distress due to his head striking the pavement"); *Galvez*, 552 F.3d at 1244, 1245 (vacating summary judgment on qualified immunity in a § 1983 case, because of force used in arrest by the officer's "repeatedly slamming" plaintiff doctor, charged with misdemeanors, "into the corner of a concrete wall with force sufficient to break his ribs and cause a leaking aneurysm" as well as psychological harm to be unconstitutional excessive force); *Davis*, 451 F.3d at 764 (reversing summary judgment on qualified immunity in a § 1983 case and finding force used to effectuate arrest was not de minimis, where in arresting plaintiff, canine-unit officer "threw [plaintiff] very hard into the dog cage causing him to hit his head on the top of the car as he entered" and from the officer's pushing on his shoulder plaintiff had told the officer was injured, plaintiff sustained "a torn rotator cuff in his right shoulder, for which he underwent a

38

surgical repair"); *Priester v. City of Riviera Beach*, 208 F.3d 919, 923-24, 928 (11th Cir. 2000) (reinstating jury verdict of excessive force and awards of compensatory and punitive damages in a § 1983 case for officers' releasing a police dog on plaintiff lying down as instructed, which resulted in fourteen puncture wounds on both legs from dog bites); *Smith v. Mattox*, 127 F.3d 1416, 1419-20 (11th Cir. 1997) (affirming denial of qualified immunity in a § 1983 case, where unlawful force in arrest was "readily apparent even without clarifying caselaw" when the officer was on plaintiff's back and, in handcuffing him, broke plaintiff's arm requiring surgery for multiple fractures, although plaintiff was not resisting).[30]

The extent of Stephens's injuries is the most telling factor in revealing the unprovoked force exerted on him by Deputy DeGiovanni. The medical evidence establishes Stephens's substantial bodily injuries from Deputy DeGiovanni's

---

[30] On appeal, Stephens's counsel argues, in addition to Deputy DeGiovanni's "battering Stephens, . . . leaving Stephens handcuffed for almost three hours in handcuffs that were too tight" caused Stephens "physical injuries, pain and suffering including, among other things headaches, back pain, and loss of sensation in [his] right hand." Appellant's Initial Br. at 9. To the extent Stephens has raised the handcuff issue on appeal, our circuit "has established the principle that the application of de minimis force, *without more*, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin*, 207 F.3d at 1257 (emphasis added), and specifically applied this principle to handcuffing in arrest situations. *See Rodriguez v. Farrell*, 280 F.3d 1341, 1352 (11th Cir. 2002) ("Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal."); *Gold v. City of Miami*, 121 F.3d 1442, 1444 (11th Cir. 1997) (concluding handcuffs applied too tight and for too long was de minimis force). Compared to Stephens's severe right-hand injury from Deputy DeGiovanni's lifting his full body weight with three fingers of his right hand twisted backward to his forearm, his experience with the handcuffs applied by Deputy DeGiovanni probably did not result in severe or permanent harm and was inconsequential.

39

forceful chest blows and throwing him against the car-door jamb were unnecessary for a compliant, nonaggressive arrestee. Orthopedic physician Dr. Schapiro diagnosed Stephens with a cervical sprain with multilevel-disc herniations, resultant foraminal stenosis, a left-shoulder, rotator-cuff tear involving the infraspinatus tendon, and sprain of the right wrist, all caused by the assault on Stephens on February 16, 2009. He further recommended an electrodiagnostic assessment to evaluate Stephens's radiating pain and little-finger numbness. Stephens has alleged the injuries from the unnecessarily excessive force used by Deputy DeGiovanni in his arrest are severe and permanent. He has attested his pain and ailments from the excessive force exerted upon him by Deputy DeGiovanni are onging and resulted in the loss of his livelihood as an automobile mechanic, leaving him indigent.

Under Stephens's version of the events at the time of his encounter with Deputy DeGiovanni, he had complied with all Deputy DeGiovanni's investigation questions and was not resisting or attempting to flee. Deputy DeGiovanni had no reason to use the force he did on Stephens that resulted in severe and permanent physical injuries as well as psychological trauma. Under the objective-reasonableness standard of *Graham*, "[a]n officer will be entitled to qualified immunity if his actions were objectively reasonable—that is, if a reasonable officer in the same situation would have believed that the force used was not excessive."

40

*Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) (citation and internal quotation marks omitted). "No reasonable police officer could believe that" the force Deputy DeGiovanni exerted on compliant, non-resisting Stephens, evidenced by his severe, permanent injuries, "was permissible given these straightforward circumstances." *Priester*, 208 F.3d at 927.

The district judge, however, concluded "that any force used by Defendant DeGiovanni was *de minimis*." Order Granting Def.'s Mot. for Summ. J. at 13. She based her conclusion on the "highly similar" facts in *Woodruff v. City of Trussville*, 434 F. App'x 852 (11th Cir. 2011),[31] and *Jones v. City of Dothan*, 121 F.3d 1456 (11th Cir. 1997). Order Granting Def.'s Mot. for Summ. J. at 13. But "the actual force used and the injury inflicted were both minor in nature" in each of these cases. *Jones*, 121 F.3d at 1460.

In stark contrast are the medically documented severe, permanent injuries sustained by Stephens from Deputy DeGiovanni's unprovoked and completely unnecessary frontal-body blows to Stephens's chest and throwing him against the car-door jamb in the course of arresting him. Deputy DeGiovanni has argued on appeal Stephens's arrest injuries were de minimis. But the amount of force used by Deputy DeGiovanni in arresting Stephens, which caused his severe and

---

[31] *Woodruff* is an unpublished opinion. In our circuit, "unpublished decisions, with or without opinion, are not precedential and they bind no one. *See* 11th Cir. R. 36-2 ('Unpublished opinions are not considered binding precedent . . . .')." *Ray v. McCullough Payne & Haan, LLC*, 838 F.3d 1107, 1109 (11th Cir. 2016) (ellipsis in original).

41

permanent injuries, documented by treating physicians, forecloses any de minimis argument by Deputy DeGiovanni. *Cf. Nolin v. Isbell*, 207 F.3d 1253, 1258 n.4 (11th Cir. 2000) ("Appellee had minor bruising which quickly disappeared without treatment.").  Notably, the permanent injuries incurred by Stephens resulted in the loss of his ability to continue his employment as an automobile mechanic and rendered him indigent.  Stephens's arrest injuries are particularly compelling, because, as eyewitness Greenwood averred, Stephens was cooperating by responding to all Deputy DeGiovanni's inquiries and not resisting whatsoever, not even raising his voice.  Instead of the similar-case method for resolving Fourth Amendment, excessive-force cases, this case requires the obvious-clarity-method analysis, based on Deputy DeGiovanni's objectively unreasonable, excessive force in arresting Stephens on misdemeanor charges. [32]

---

[32] In addition to her conclusion the force used in arresting Stephens by Deputy DeGiovanni was de minimis, the district judge alternatively decided, even if a Fourth Amendment violation had occurred, it would not qualify as a clearly established right: "There is no doubt, of course, that the use of excessive force in the context of an arrest constitutes the violation of a clearly established constitutional right.  The question, however, is *whether [Deputy DeGiovanni's] use of force under these circumstances was clearly established as excessive by controlling and factually similar case law*."  Order Granting Def.'s Mot. for Summ. J. at 14 n.8 (emphasis added).  Based on cases where the alleged excessive force was not to the injury-causing proportion Deputy DeGiovanni exerted on Stephens, the judge concluded "it seems clear that [Deputy DeGiovanni's] conduct was not so outrageous that *every* reasonable officer in [his] position would inevitably conclude that the force used was unlawful." *Id.* at 16.  Reviewing the specific facts of this case, especially Stephens's answering all Deputy DeGiovanni's questions and not resisting or attempting to flee, the responsive force used by Deputy DeGiovanni was objectively unreasonable, gratuitous, excessive and unwarranted on a common-sense level any reasonable officer should know is wrong.  "If [Stephens's] allegations are true, and we must assume that they are at this stage of the case, [Deputy DeGiovanni's] force was unnecessary,

"[G]ratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley*, 526 F.3d at 1330 (noting circuit examples of *Lee*, 284 F.3d 1188, and *Slicker*, 215 F.3d 1225). "We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands," as Stephens says he was doing at the time of his arrest by Deputy DeGiovanni. *Saunders*, 766 F.3d at 1265 (citing cases).[33]  On these obvious-clarity facts, "no particularized preexisting case law was necessary for it to be clearly established that what [Deputy DeGiovanni] did violated [Stephens's] constitutional right to be free from the excessive use of force" in his arrest. *Priester*, 208 F.3d at 927.  We vacate the judge's order

disproportionate, and constitutionally excessive." *Saunders*, 766 F.3d at 1268.  This is an obvious-clarity case.

[33] In the context of an Eighth Amendment excessive-force claim, the Supreme Court noted the "core judicial inquiry" for an excessive-force claim under the Eighth Amendment is not based on the extent of the plaintiff's injury, but rather on "the nature of the force" used. *Wilkins v. Gaddy*, 559 U.S. 34, 39, 130 S. Ct. 1175, 1179 (2010).  The Court explained a plaintiff "who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.* at 38, 130 S. Ct. at 1178-79.  Our court has adopted the *Wilkins* reasoning in the Fourth Amendment context, determining an officer's punching a non-resisting, handcuffed suspect in the stomach was excessive force violating the Fourth Amendment. *Saunders*, 766 F.3d at 1270 (citing *Hadley*, 526 F.3d at 1330, and *Slicker*, 215 F.3d at 1231-32).  While these cases involve plaintiffs who were handcuffed after their arrest before excessive force was used by the officer, the same rationale applies to the use of gratuitous force when the excessive force is applied prior to the handcuffing but in the course of the investigation and arrest, all part of the arrest procedure, as was the situation for Stephens.  But injury and force "are only imperfectly correlated, and it is the latter that ultimately counts." *Wilkins*, 559 U.S. at 38, 130 S. Ct. at 1178.

granting summary judgment to Deputy DeGiovanni on Stephens's excessive-force claim and remand for further proceedings consistent with this opinion.

Because the judge granted summary judgment to Deputy DeGiovanni on Stephens's federal claim of excessive force, she declined to exercise supplemental jurisdiction over his state-law claims of assault and battery against the Broward Sheriff's Office (Count I) and Deputy DeGiovanni (Count VI) and dismissed them without prejudice.  Order Granting Def.'s Mot. for Summ. J. at 23.  "The constitutional 'case or controversy' standard confers supplemental jurisdiction over all state claims which arise out of a common nucleus of operative fact with a substantial federal claim."  *Lucero v. Trosch*, 121 F.3d 591, 597 (11th Cir. 1997) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724-25, 86 S. Ct. 1130, 1138 (1966)).  Under 28 U.S.C. § 1367, a federal court has "*power* to exercise supplemental jurisdiction," and "*discretion* not to exercise such jurisdiction."[34]  *Id.*  By vacating the grant of summary judgment for Deputy

---

[34] "(a) Except as provided in subsections (b) and (c) . . ., in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. . . .
. . . .

 (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
. . . .

(3) the district court has dismissed all claims over which it has original jurisdiction . . . ."

28 U.S.C. § 1367(a), (c)(3).

DeGiovanni on Stephens's federal excessive-force claim, we reinstate the district judge's original federal jurisdiction over Stephens's excessive-force claim and remand for further proceedings on that claim.  We also vacate the judge's dismissal without prejudice of Stephens's state-law claim of assault and battery against Deputy DeGiovanni and leave to the discretion of the judge how to handle the state-law claim of assault and battery on remand.[35]

## III. CONCLUSION

Accepting Stephens's version of the events involved in his arrest, this is an obvious-clarity case under the jurisprudence of the Supreme Court and our circuit for a § 1983 Fourth Amendment, excessive-force claim.  While we affirm the denial of Stephens's claim of false arrest because of his nolo contendere plea, we vacate the grant of summary judgment to Deputy DeGiovanni on Stephens's excessive-force claim.  We also vacate the judge's dismissal without prejudice of Stephens's state-law claim of assault and battery.  On remand for further

---

[35] In an excessive-force claim under Florida law, "police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest, and officers are only liable for damage where the force used is 'clearly excessive.'" *Davis*, 451 F.3d at 768 (quoting *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. Dist. Ct. App. 1996)).  "If an officer uses excessive force, the 'ordinarily protected use of force . . . is transformed into a battery.'" *Id.* (quoting *Sanders*, 672 So. 2d at 47).  While Stephens appealed summary judgment granted to Deputy DeGiovanni regarding his false-arrest and excessive-force claims, he did not appeal the dismissal of the Broward Sheriff's Office from his case by pursuing his state-law claim of assault and battery against the Broward Sheriff's Office.  Consequently, the Broward Sheriff's Office is not a party to Stephens's appeal in this court.  *See United States v. Willis*, 649 F.3d 1248, 1254 (11th Cir. 2011) ("A party seeking to raise a claim or issue on appeal must plainly and prominently so indicate. . . .  Where a party fails to abide by this simple requirement, he has waived his right to have the court consider that argument." (citation and internal quotation marks omitted)).

45

proceedings consistent with this opinion, the judge has discretion to reinstate

Stephens's state-law claim of assault and battery.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**