[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-12093
_____

D.C. Docket No. 9:17-cv-80327-KAM

LORI ANN HUEBNER,

Plaintiff-Appellant,

versus

RIC BRADSHAW,
as Sheriff of Palm Beach County,
PETER MCDONOUGH,
both individually and in his official capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 22, 2019)

Before WILLIAM PRYOR, NEWSOM, and BRANCH, Circuit Judges.

NEWSOM, Circuit Judge:

You can't make this stuff up. We have hair-pulling, wrist-scratching, face-punching, and rock-throwing—all the makings of a good old-fashioned schoolyard scrap. But alas, the combatants in the fracas underlying this Fourth Amendment case were grown-ups—sisters, in fact. Sheesh.

Sister No. 1, Lori Huebner, was arrested for simple battery following an altercation with Sister No. 2, Kathleen Dobin. Huebner later sued Deputy Peter McDonough, alleging that he violated her Fourth Amendment rights (1) by arresting her without probable cause—in particular, by relying on what she claims was untrustworthy information and by failing to conduct an adequate investigation—and (2) by using excessive force in the course of effectuating the arrest. The district court granted summary judgment to McDonough, and Huebner now appeals.

We hold that McDonough had ample probable cause to arrest Huebner—the underlying information indicating that she had battered her sister was credible and his investigation was sufficient—and that McDonough didn't use excessive force in making the arrest.[1]

---

[1] Huebner also brought state-law claims against both McDonough and Ric Bradshaw, the Sheriff of Palm Beach County. The district court granted summary judgment against her on those claims, as well. Huebner doesn't challenge those rulings on appeal.

**I**

**A**

The sad story underlying this appeal began when one of our two antagonists, Kathleen Dobin, dropped off her elderly mother at her sister Lori Huebner's home in Palm Beach County, Florida. Just as Dobin was about to leave, she and Huebner got into a dispute, apparently over the specifics of their cancer-stricken mother's last wishes.[2] Dobin alleged that as she was pulling away, Huebner ran outside, reached into Dobin's car, and "pulled her by the hair, punched her several times in her left cheek, and scratched her on the left wrist." Dobin called 911; just 11 minutes later, Huebner did the same. About half an hour after the fight, Deputy Yhon Gutierrez met Dobin down the street from Huebner's house. He took Dobin's statement, in which she alleged that Huebner had tried to attack her while she was inside her car—"pulling [her] hair" and "punching [her] in the face"—and that even Huebner's husband got in on the action, coming out of his house to "throw[] rocks at [Dobin's] car." Roughly an hour after the 911 calls came in, Deputy Peter McDonough arrived to relieve Gutierrez. He examined Dobin for

---

[2] We recite the facts in the light most favorable to Huebner, the party against whom summary judgment was granted. *See Cozzi v. City of Birmingham*, 892 F.3d 1288, 1293 (11th Cir. 2018), *cert. denied sub nom.*, *Thomas v. Cozzi*, 139 S. Ct. 395 (2018) (mem.).

scratches or other injuries but didn't find any.  Dobin's car showed no signs of damage.

McDonough then went to Huebner's home, where her daughter answered the door.  Huebner came to the door and identified herself, and McDonough placed her under arrest.  Huebner said that she was the one who had called 911, that she had "a cut on [her] arm where [Dobin] scratched [her]," and that she had "two witnesses" to the incident with her sister—presumably her daughters.  McDonough declined to speak with Huebner's "witnesses"; instead, Huebner alleges, he handcuffed her and "tried to pull [her] rings off [her] finger."  Throughout the arrest, Huebner says, she repeatedly complained that McDonough was hurting her—that the handcuffs were too tight, that her arms were pulled too far back, and that his efforts to remove her rings were painful.[3]

McDonough initially took Huebner to a police sub-station, where he had to complete domestic-battery paperwork before he could transport her to the main detention center.  Because the small sub-station didn't have a place to hold arrestees, Huebner remained in the patrol car for what she says was between an hour and a half and two hours.  McDonough explained to Huebner how to position herself in the car to minimize the discomfort caused by the handcuffs, but she

---

[3] McDonough contends that he removed Huebner's rings as a courtesy so that he wouldn't have to impound them at the jail.

declined because it too, she said, was uncomfortable.  Although the record isn't clear about exactly what happened next, we think we can fairly deduce that McDonough took Huebner from the sub-station to the central jail, where she was processed and then later released.

Huebner alleges that as a result of her arrest, she suffers from neck and shoulder pain as well as and nerve damage.  She has received epidural and cortisone shots for the pain, and her doctor attributes her injuries to her handcuffing.

**B**

Huebner brought suit under 42 U.S.C. § 1983, claiming that her arrest violated the Fourth Amendment in two respects.  First, she asserted that McDonough arrested her without probable cause.  In particular, she said, McDonough failed to conduct a reasonable investigation because he relied solely on her sister's unreliable and uncorroborated statements and ignored exculpatory evidence.  Second, and separately, Huebner alleged that McDonough used excessive force during the arrest by pulling her arms too far behind her back, cinching the cuffs too tight, and tugging on her fingers and arms to remove her rings.  Huebner complains that she now has nerve damage that causes neck and shoulder pain as well as numbness in her arms and fingers, all as a result of the cuffing.

5

The district court granted summary judgment to McDonough on both counts. It concluded that McDonough had probable cause to believe that Huebner had committed simple battery, in violation of Florida Statute § 784.03(1)(a). The court explained that McDonough was entitled to rely on Dobin's recitation of events and, further, that the absence of visible injury to Dobin's body, which Huebner emphasized, didn't prevent a probable-cause finding because Florida battery requires only a slight intentional touching—physical harm isn't an element. Alternatively, the district court found that even if McDonough didn't have actual probable cause, he at least had "arguable probable cause," which entitled him to qualified immunity.

The district court also held that the painful handcuffing that Huebner alleged, without more, didn't amount to excessive force. In so holding, the court observed that McDonough's cuffing technique was relatively common and accepted.

Huebner appeals both rulings.

## II

To receive qualified immunity, an officer bears the initial burden of establishing that he was acting within his discretionary authority. *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). Once he does so, the plaintiff must show that qualified immunity isn't appropriate. *Id.* To meet her burden, a plaintiff

6

must show both (1) that she suffered a violation of a constitutional right and (2) that the right she claims was "clearly established" at the time of the alleged misconduct. *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730 (2002), and *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Neither party here disputes that McDonough was acting within his discretionary authority when he arrested Huebner, so we turn to the two-part test to determine whether qualified immunity is appropriate. *See id.* We may address the two parts in either order. *See Pearson v. Callahan*, 555 U.S. 223, 242 (2009). Here, we begin—and find we can end—at step one, by asking whether Huebner has demonstrated that McDonough violated her Fourth Amendment rights.[4]

The Fourth Amendment, of course, protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Huebner contends that her arrest—her "seizure"—was "unreasonable" in two respects. First, she says that McDonough arrested her without the necessary probable cause because he didn't have reasonably trustworthy information indicating her guilt and because he failed to conduct an adequate investigation. Second, she complains that McDonough used excessive force in the course of effectuating the arrest. We will consider those contentions in turn.

---

[4] We review the district court's grant of summary judgment *de novo*. *Cozzi*, 892 F.3d at 1293. Summary judgment is proper if there are no genuine issues of material fact and if McDonough is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## A

In order to make an arrest without a warrant, a police officer must have probable cause to believe that the suspect committed a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). In *Beck*, the Supreme Court described the probable-cause inquiry as follows: whether, at the time of the arrest, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Id.* Probable cause exists when an arrest is "objectively reasonable under the totality of the circumstances." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (quoting another source).

Huebner contends that McDonough lacked probable cause to arrest her for two primary reasons: first, she says, he didn't have reasonably trustworthy information; and second, he didn't conduct an adequate investigation. Again, we'll take Huebner's arguments in order.

## 1

As already indicated, McDonough arrested Huebner for simple battery. In relevant part, Florida law defines battery as follows:

> The offense of battery occurs when a person:
>
> 1. Actually and intentionally touches or strikes another person against the will of the other; or

8

2. Intentionally causes bodily harm to another person.

Fla. Stat. § 784.03(1)(a) (2019). It doesn't take much to commit battery under Florida law. As the statute's plain text indicates—in particular, the first part of the first part of the disjunction—any unwanted "touch[]" will suffice. *Id.* The Florida Supreme Court has confirmed that "no matter how slight" the touching is, if it's intentional, that's enough. *Florida v. Hearns*, 961 So. 2d 211, 218 (Fla. 2007). Physical injury, moreover, is *not* required—the battery "may be committed with only nominal contact." *Id.* at 218–19.

So, did McDonough have probable cause to arrest Huebner for simple battery? We think it clear that he did. To begin, McDonough had Dobin's 911 call identifying Huebner as her assailant, so at the very least he had reason to believe that this was a two-party tango. More importantly, McDonough had (twice over) Dobin's sworn statement, in which she alleged that Huebner had "pull[ed] [her] hair" and "punch[ed] [her] in the face." McDonough initially received the statement that Dobin had given to Deputy Gutierrez, who got to the scene first. And when McDonough arrived, he personally verified Dobin's account with her. Dobin's statement gave McDonough everything he needed—it clearly described (at the very least) an intentional unwanted touching. And indeed, Huebner seems to admit that Dobin's statement was sufficient: "Based solely on Dobin's sworn

9

statement," she concedes in her brief to us, "McDonough may have had probable cause for the arrest …."

Huebner says, though, that the probable cause that Dobin's statement provided evaporated "once [McDonough] found no physical evidence" to corroborate it—no scratches, red marks, etc. We reject that contention for two reasons. First, as just explained, physical injury isn't an element of Florida battery; a mere touching (of the sort that wouldn't necessarily leave marks) will suffice. So as a matter of law, the absence of any evidence of such an injury isn't particularly probative. Second, and moreover, given the particular allegations here—which comprised only hair-pulling, cheek-punching, and wrist-scratching—the absence of physical evidence was hardly surprising, especially given that McDonough didn't see Huebner until an hour after the incident.

McDonough was "not required to forego arresting" Huebner "based on initially discovered facts showing probable cause simply because [Huebner] offered a different explanation." *Marx v. Gumbinner*, 905 F.2d 1503, 1507 n.6 (11th Cir. 1990); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."). Nor was McDonough "required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present[ed] a sufficient basis for believing that an offense ha[d] been

10

committed." *Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir. 2002), *abrogated on other grounds by Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018).  We think that the totality of the evidence here provided ample basis for concluding that Huebner had committed a battery as defined by Florida law.

*   *   *

Battery, we understand, will often be a he-said/she-said affair—or, as is the case here, she-said/she-said.  And for that reason, one could perhaps make the case that police should exercise discretion not to arrest in circumstances like those presented by the sister-squabble between Huebner and Dobin.  But that doesn't mean that they violate the Constitution when they do so.  McDonough had Dobin's 911 call, her sworn statement, and his own follow-up conversation with her.  That was enough to give him probable cause to believe, at the very least, that Huebner had touched Dobin against her will.  *Cf. Atwater v. City of Lago Vista*, 532 U.S. 318, 346–55 (2001) (recognizing that a police officer "at best[] exercise[ed] extremely poor judgment" when he arrested a woman for violating a fine-only seatbelt statute but nonetheless rejecting the woman's Fourth Amendment challenge because her arrest was supported by probable cause).

**2**

Huebner separately (but relatedly) argues that in the course of developing probable cause to arrest, McDonough failed to conduct a reasonable investigation.

11

Seemingly in an effort to set the constitutional baseline for investigational adequacy, Huebner relies principally on *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004). *Kingsland*, though, is distinguishable.

To call the facts of *Kingsland* jarring would be an understatement. The plaintiff there, Misty Kingsland, was involved in a car accident with an off-duty police officer, after which she climbed out of the wreck and "sat down in a pile of shattered glass." *Id.* at 1223. Although a number of officers responded to the scene—ultimately as many as 20—none of them approached Kingsland for a full 30 minutes, either to ask for her version of events or to inquire about her well-being. *Id.* When they finally did, Kingsland told the officers that she "had sustained injuries to her head" and "was dizzy and could not stand up." *Id.* No one offered Kingsland any medical care—at the scene, or ever. *Id.* at 1223–25. Although one officer claimed to have detected an odor of cannabis emanating from Kingsland and her vehicle, nobody ever searched her truck, summoned drug-sniffing dogs, or found any pot. *Id.* at 1223–24. When Kingsland (presumably still dizzy and sick) failed her field-sobriety tests, the officers put her in a cruiser and told her "that she was being transported to the hospital for treatment and more tests"; in fact, they took her into custody and drove her to "a DUI testing facility." *Id.* at 1224. Once there, the officers administered multiple Breathalyzer tests, "all of which came back negative—with a 0.000% alcohol content." *Id.* Notably—and

12

unsettlingly—in the face of the clean results, the officer completing paperwork asked a colleague "what he should then write." *Id.* Told to shift the focus back to marijuana—"to write that Kingsland had a strong odor of cannabis emitting from her breath"—the officer "threw away the form he was writing on and started writing on a new form." *Id.* After taking additional tests and providing a urine sample—which also later came back clean— Kingsland was handcuffed, transported to jail (still no medical care) and charged with DUI. *Id.* at 1225. Kingsland sued, and the district court granted the officers summary judgment, but we reversed, holding that there were genuine issues of material fact as to whether the officers had conducted a reasonable investigation. *Id.* at 1225, 1230–31.

Citing *Kingsland*, Huebner contends that McDonough's "failure to objectively investigate, failure to interview reasonably available witnesses, and failure to obtain easily obtainable evidence" require the conclusion that her arrest was unlawful—and indeed so clearly unlawful that McDonough should be denied qualified immunity. We don't think so. *Kingsland* and this case are apples and oranges. In *Kingsland*, the arresting officers didn't just fail to follow-up or even turn a blind eye, they affirmatively misrepresented their intentions and came dangerously close—if they didn't go all the way—to manufacturing evidence. Here, as already noted, Huebner concedes that "[b]ased solely on Dobin's sworn statement, McDonough may have had probable cause for the arrest of … Huebner"

13

as an initial matter.  And for reasons we have already explained, we reject

Huebner's contention that probable cause evanesced "once [McDonough] found no

physical evidence"—first because physical injury isn't a required element of

simple battery, and second because the sort of battery alleged here wouldn't

necessarily (or even likely) have left any lasting marks.  In any event, not looking

for scratches when making an arrest for a crime that doesn't require them just isn't

the same as not looking for drugs or alcohol when making an arrest for DUI.  *Cf.*

*Kingsland*, 382 F.3d at 1224.[5]

*  *  *

We hold that Huebner hasn't shown that McDonough lacked probable cause

to arrest her for battery, that he relied on untrustworthy information in formulating

probable cause, or that he failed to conduct an adequate investigation into her

guilt.[6]

---

[5] Huebner also cites *Cozzi*, 892 F.3d 1288, for the proposition that because McDonough didn't find any "physical evidence corroborating her version of events" he didn't conduct a reasonable investigation.  But in *Cozzi*, we held that an officer failed to conduct a reasonable investigation where he arrested a man with "only one tattoo" after showing the man's roommate a picture of the suspect with "numerous tattoos up and down his arm."  *Id.* at 1292.  Cozzi's (relative) lack of body art should have been immediate and conclusive evidence that he wasn't the guy; in contrast, even an investigation that proved that Dobin didn't have any scratches would not (for reasons already explained) have exonerated Huebner of simple battery.

[6] Accordingly, we needn't reach the question whether McDonough had "arguable probable cause," which comes into play only at the second, "clearly established" step of the qualified-immunity analysis.  *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993).

14

**B**

We can make quicker work of Huebner's excessive-force claim. The Fourth Amendment prohibits "the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)). Huebner challenges McDonough's use of force as excessive in several respects. For starters, Huebner asserts that when McDonough handcuffed her, she complained that the cuffs were too tight, and he replied that they were "man handcuffs" and tightened them again. Huebner further contends that McDonough "repeatedly and forcefully tugged on her fingers and arms in an effort to remove her rings." Finally, Huebner complains that she was left, handcuffed, in a patrol car for as long as two hours. All of this, she says, led to "significant, permanent and debilitating injuries," including severe neck damage, shoulder pain and numbness, as well as the need for disc-replacement surgery.

At this procedural juncture, "the question we ask is whether, under [the plaintiff's] version of the facts, [the officer] behaved reasonably in the light of the circumstances before him." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1315 (11th Cir. 2017) (citations and quotations omitted). And when looking specifically at an excessive-force claim, we look to "whether an officer's conduct in making an arrest is objectively reasonable or if it is an over-reactive, disproportionate action for the situation." *Id.* at 1317.

15

We have long and repeatedly recognized that when making a custodial arrest, "some use of force … is necessary and altogether lawful." *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003). The force used "must be reasonably proportionate" to the need, which we measure by "the severity of the crime, the danger to the officer, and the risk of flight." *Lee*, 284 F.3d at 1198 (citing *Graham*, 490 U.S. at 394–95). Even though Huebner exhibited no meaningful flight risk, and even though her crime was relatively minor, the force employed by McDonough here wasn't remotely unusual or disproportionate. Officers routinely pull arrestees' arms behind their backs, and we have repeatedly held that painful handcuffing alone doesn't constitute excessive force. *See Rodriguez v. Farrell*, 280 F.3d 1341, 1351–52 (11th Cir. 2002) (holding that even where an officer "grabbed plaintiff's arm, twisted it around plaintiff's back, jerk[ed] it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that [the officer] was hurting him" the officer's actions didn't constitute excessive force); *see also Vinyard*, 311 F.3d at 1348 n.13 (collecting cases holding that painful handcuffing and pushing of arrestees, including against vehicles, is not excessive force).[7]

---

[7] It's true, as Huebner contends, that we may consider the severity of a plaintiff's injuries as relevant to the excessive-force inquiry. *See, e.g.*, *Stephens*, 852 F.3d at 1324–27; *Rodriguez*, 280 F.3d at 1351–52. Two problems. First, beyond fragments of her own deposition testimony, Huebner didn't provide any evidence—medical records, etc.—to substantiate her claimed injuries. *But cf.*, *Stephens*, 852 F.3d at 1327 (noting that plaintiff's injuries were "documented by treating physicians"); *Rodriguez*, 280 F.3d at 1351 (noting testimony of "[p]laintiff's

McDonough employed a common handcuffing technique, and he attempted (to no avail) to tell Huebner how to get more comfortable in the patrol car. The force that McDonough used in arresting Huebner was not constitutionally excessive.

## III

We hold (1) that McDonough had probable cause to arrest Huebner for simple battery—the information underlying his probable-cause assessment was sufficient and his investigation was adequate—and (2) that McDonough didn't use excessive force in the course of effectuating the arrest. Because Huebner hasn't shown a violation of her Fourth Amendment rights, McDonough is entitled to qualified immunity.[8]

The judgment of the district court is **AFFIRMED.**

---

orthopedic surgeon"). Second, even when substantiated by medical records or expert testimony, we have rejected excessive-force claims predicated on handcuffing-related harms similar to— and even worse than—those alleged here. *See, e.g.*, *Stephens*, 852 F.3d at 1326 n.30 (rejecting Fourth Amendment claim based on allegation that arresting officer left suspect handcuffed "for almost three hours in handcuffs that were too tight" and thereby caused "physical injuries, pain and suffering including, among other things headaches, back pain, and loss of sensation in [his] right hand"); *Rodriguez*, 280 F.3d at 1351 (rejecting claim based on allegation that officer's handcuffing technique aggravated a preexisting injury requiring "more than twenty-five subsequent surgeries and ultimately amputation of the arm below the elbow").

[8] Because we hold that Huebner hasn't shown that her constitutional rights were violated, we have no cause to consider the second-order qualified-immunity question whether the law on which she relies was "clearly established" at the time of her arrest.