[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13572
_____

D.C. Docket No. 3:15-cv-00390-MCR-CJK


KENNETH BAILEY,

Plaintiff - Appellant,

versus

SHAWN T. SWINDELL,
in his individual capacity,
MICHAEL RAMIREZ,
in his individual capacity,
SHERIFF OF SANTA ROSA COUNTY FLORIDA,

Defendants - Appellees,

WENDELL HALL,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(October 16, 2019)

Before WILSON and NEWSOM, Circuit Judges, and PROCTOR,[*] District Judge.

NEWSOM, Circuit Judge:

What began as a relatively low-key consensual encounter between Santa Rosa County Sheriff's Deputy Shawn Swindell and Kenneth Bailey escalated quickly into a forceful arrest. Taking the facts in the light most favorable to Bailey, as we must given the case's procedural posture, the short story goes like this: Swindell showed up at Bailey's parents' home requesting to speak with Bailey about an earlier incident involving his estranged wife. When Bailey came to the door, Swindell asked to talk to him alone, but Bailey declined. After the two argued briefly, Bailey went back inside the house. Then, presumably fed up with Bailey's unwillingness to cooperate, Swindell pursued him across the threshold and (as Bailey describes it) "tackle[d] [him] . . . into the living room" and arrested him.

Bailey sued, arguing that his arrest violated the Fourth Amendment. The district court granted summary judgment in Swindell's favor, and Bailey now appeals on two grounds. First, Bailey disputes that Swindell had probable cause to arrest him in the first place. Second, Bailey contends that in any event—*i.e.*, even assuming that probable cause existed—Swindell unlawfully arrested him inside his

---

[*] Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

parents' home without a warrant.  Unsurprisingly, Swindell disagrees on both counts and, further, asserts that he is entitled to qualified immunity.

Without deciding whether Bailey's arrest was supported by probable cause—or, as it goes in the qualified-immunity context, "arguable probable cause"—we reverse.  Even assuming that Swindell had probable cause, he crossed what has been called a "firm" and "bright" constitutional line, and thereby violated the Fourth Amendment, when he stepped over the doorstep of Bailey's parents' home to make a warrantless arrest.

## I

### A

The seeds of the confrontation between Swindell and Bailey were planted when Swindell responded to a request from police dispatch to investigate an argument between Bailey and his estranged wife, Sherri Rolinger.[1]  The argument had occurred when Bailey stopped by the couple's marital home to retrieve a package.  Bailey no longer lived in the home with Rolinger and their two-year-old son, as the couple was embroiled in a contentious divorce.  When Bailey rang the doorbell—seemingly more than once—he woke the boy, who started to cry. Rolinger came to the door but refused to open it and told Bailey to leave.  Bailey

---

[1] Because this case arises on the appeal of the district court's summary judgment for Swindell, we take and construe the facts in the light most favorable to Bailey.  *See Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).

responded that he wasn't leaving without his package, and Rolinger eventually informed him that she had put it in the mailbox. Bailey retrieved the package and departed.

Rolinger went to her mother's house and called 911 to report the incident to police. In response to the call, Deputy Andrew Magdalany was dispatched to interview Rolinger, and Swindell went to talk to Bailey. At some point before Swindell reached Bailey, he called Magdalany and gathered additional details about the encounter and the surrounding circumstances. Magdalany told Swindell, for instance, that in the three months since Bailey's separation from his wife, he had visited the marital residence repeatedly, moved items around in the house, and installed cameras without his wife's knowledge. Magdalany also explained that Rolinger was "fear[ful]" and believed that her husband had "snapped." Even so, he told Swindell that he had not determined that Bailey had committed any crime.

Armed with this information, Swindell approached Bailey's parents' home—where Bailey was living—knocked on the door, and told Bailey's mother Evelyn that he wanted to speak to Bailey.[2] Bailey came to the door and stepped

---

[2] Taking the facts in the light most favorable to Bailey, the district court imputed more knowledge to Swindell than it should have. Giving Bailey the benefit of the doubt, Swindell didn't know at the time that he approached Bailey that Bailey and his wife were "embroiled in a contentious divorce," that Bailey "banged on the closed front door and screamed at Sherri Rolinger," that this disturbance was loud enough that "their two-year-son [sic] woke up crying," or that Rolinger was "'crying' and 'very distraught.'" We must assume that Swindell learned these facts only after arresting Bailey, and that before the confrontation Swindell knew only what dispatch and Magdalany had told him. Indeed, Swindell indicated that all the relevant

4

out onto the porch, accompanied by his brother Jeremy.  Bailey, Evelyn, and

Jeremy all remained on the porch during the encounter, although only Bailey spoke

with Swindell.  Swindell immediately advised Bailey that he was not under arrest.

Shortly thereafter, Swindell retreated off the porch to establish what he described

as a "reactionary gap" between himself and Bailey—a distance that Jeremy

estimated could have been as far as 13 feet.  Swindell asked Bailey to speak with

him privately by his patrol car, but Bailey declined, saying that he wasn't

comfortable doing so.  Swindell then told Evelyn and Jeremy to go back inside so

that he could talk to Bailey alone, but they, too, refused.  Bailey asked Swindell

why he was there, but Swindell initially didn't respond; he eventually said that he

was there to investigate, although he never clarified exactly what he was

investigating.  Frustration growing, Swindell then repeatedly demanded—at a

---

information he had at the time that he confronted Bailey was contained in the first full paragraph of his offense report, which we reproduce here:

> While speaking with Dep. Magdalany he advised me of the following: [a]ccording to Sherri, she and Kenneth separated approximately 3 months ago[,] and Kenneth moved out.  Since this time, Kenneth has continuously harassed Sherri by showing up at their marital home unannounced while she is home and while she is not home.  During the incidents where Sherri is not home Kenneth will turn pictures face down, and move things inside the home to let his presence be known.  During this time frame[,] Kenneth had cameras installed inside the home without her knowledge.  Sherri also told Dep. Magdalany that Kenneth is not acting right and has "snapped".  During tonight's incident, Sherri and Kenneth got into a verbal argument, but at this time Dep. Magdalany had not determined if a crime occurred and was still investigating the incident.

yell—that Evelyn and Jeremy return to the house and that Bailey talk to him by his patrol car, but no one complied.

Bailey then announced that he was heading inside and turned back into the house. Without first announcing an intention to detain Bailey, Swindell charged after him and "tackle[d] [him] . . . into the living room," simultaneously declaring, "I am going to tase you." Importantly for our purposes, by that time Bailey was—as he, Evelyn, and Jeremy all testified—already completely inside the house. Swindell then proceeded to arrest Bailey.

## B

Bailey sued for false arrest under the Fourth Amendment, but the district court rejected his claim.[3] In particular, the court reasoned that when Bailey retreated into his house, he at least arguably obstructed Swindell in the lawful exercise of his duty, and thereby violated Fla. Stat. § 843.02, which makes resisting an officer without violence a first-degree misdemeanor. Accordingly, the court granted Swindell qualified immunity and granted summary judgment in his favor.

---

[3] Bailey brought other claims that are not before us on appeal. The district court allowed a Fourth Amendment excessive-force claim to go to trial, and the jury returned a verdict for Swindell. Bailey doesn't challenge that verdict on appeal. Nor does Bailey challenge the dismissal of his state-law claims.

Significantly, the district court failed to address Bailey's argument—which he reiterates on appeal—that even assuming that probable cause existed, Swindell violated "clearly established" law when he arrested Bailey inside his parents' home without a warrant.[4]  We agree and accordingly reverse.

## II

To obtain the benefit of qualified immunity, a government official "bears the initial burden of establishing that he was acting within his discretionary authority." *Huebner v. Bradshaw*, 935 F.3d 1183, 1187 (11th Cir. 2019) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)).  Where, as here, it is undisputed that this requirement is satisfied, the burden shifts to the plaintiff to "show both (1) that [he] suffered a violation of a constitutional right and (2) that the right [he] claims was 'clearly established' at the time of the alleged misconduct." *Id.*

Bailey contends that his arrest violated clearly established Fourth Amendment law for two distinct reasons.  First, he asserts that Swindell lacked probable cause to arrest him.  Second, he argues that, in any event, Swindell impermissibly arrested him inside his home without a warrant.

---

[4] The district court must have rejected this argument in reaching the result that it did, because Bailey clearly raised it.  In particular, Bailey contended that "[i]t would not be enough that Deputy Swindell had a good faith belief, probable cause, or arguable probable cause that a misdemeanor crime had been committed . . . [as] Deputy Swindell was not free to enter Mr. Bailey's home for the purpose of either detaining him or arresting him."  Continuing, Bailey argued that "it is not easy to see how the warrantless entry . . . is anything but a violation of an established right to be free from unreasonable seizure . . . in your own home."

7

**A**

It is clear, of course, that "[a] warrantless arrest without probable cause violates the Constitution." *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990) (citation omitted). But if "reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendant[] could have believed that probable cause existed," then the absence of probable cause is not "clearly established," and qualified immunity applies. *Von Stein v. Brescher*, 904 F.2d 572, 579–80 (11th Cir. 1990). In that circumstance, what we have called "arguable probable cause" suffices to trigger qualified immunity. *Skop*, 485 F.3d at 1137.[5]

Swindell contends, and the district court held, "that Deputy Swindell had arguable probable cause to arrest Bailey for violating Fla. Stat. § 843.02." We needn't decide whether the district court was correct in so holding because we ultimately conclude that Bailey's arrest was effectuated inside Bailey's home

---

[5] Some of our decisions have erroneously suggested that the "arguable probable cause" standard applies at the first step of the qualified-immunity analysis, in determining whether a constitutional violation has occurred. *See, e.g.*, *Storck v. City of Coral Springs*, 354 F.3d 1307, 1317 (11th Cir. 2003) ("[V]iewing the facts in the light most favorable to Storck, she has not established a constitutional violation because, at the very least, McHugh had arguable probable cause."). Controlling case law makes clear, however, that "arguable probable cause" is a step-*two* standard. *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) ("Sellers-Sampson is entitled to qualified immunity because he had arguable probable cause to arrest Lirio. Put differently, Lirio has not shown that the law of probable cause is so clearly established that no reasonable officer, faced with the situation before Sellers-Sampson, could have believed that probable cause to arrest existed."), *modified*, 14 F.3d 583 (11th Cir. 1994); *see also Huebner*, 935 F.3d at 1190 n.6 ("Accordingly, we needn't reach the question whether McDonough had 'arguable probable cause,' which comes into play only at the second, 'clearly established' step of the qualified-immunity analysis." (citation omitted)).

8

without warrant, consent, or exigent circumstances. Such an arrest violates the Fourth Amendment even if supported by probable cause. For present purposes, therefore, we will simply assume—without deciding—that Swindell had probable cause.

**B**

When it comes to warrantless arrests, the Supreme Court has drawn a "firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980). Accordingly, while police don't need a warrant to make an arrest in a public place, the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to" arrest him. *Id.* at 576. Swindell doesn't dispute *Payton*'s rule as a general matter, but he insists that this case is controlled by the Court's pre-*Payton* decision in *United States v. Santana*, 427 U.S. 38 (1976)—which, he says, holds that "standing in a doorway or on a porch is considered a public place, wherein there is no expectation of privacy or need to obtain a warrant to initiate an arrest." Br. for Appellee at 50. Although the facts of this case do bear some superficial similarity to those in *Santana*, we find ourselves constrained to reject Swindell's argument.

In *Santana*, officers who had just conducted a sting operation and arrested a heroin dealer returned to arrest the dealer's supplier. 427 U.S. at 40. As the officers approached, they saw the suspect, Dominga Santana, in her doorway

9

roughly 15 feet away holding a brown paper bag. *Id.* The officers "got out of their van, shouting 'police,' and displaying their identification." *Id.* Santana retreated through the door and into her house, but the officers followed and took her into custody. *Id*. at 40–41. The Supreme Court approved the warrantless arrest because it was supported by probable cause and, importantly here, because it began in a "public place." *Id*. at 42 (quotation marks omitted). For the Court, the fact that the arrest continued into Santana's home after beginning on the threshold presented no difficulty because the police there were engaged in a case of "true hot pursuit"—an exigent circumstance that justifies a departure from the usual warrant requirement. *Id*. at 42–43 (quotation marks omitted).

While this case similarly involves an arrest in or around a doorway, *Santana* does not stand for the proposition that the Fourth Amendment authorizes any warrantless arrest that begins near an open door. Santana's arrest was initiated while she was standing—at least partly—outside her house, and she only subsequently retreated within it. Bailey, by contrast, was—again, taking the facts in the light most favorable to him—completely inside his parents' home before Swindell arrested him. Swindell neither physically nor verbally, and neither explicitly nor implicitly, initiated the arrest until Bailey had retreated fully into the house. As we will explain, that means that this case is controlled by *Payton*, not *Santana*.

10

*Payton* involved two consolidated cases.  In the first, officers showed up at Theodore Payton's apartment to arrest him the day after they had "assembled evidence sufficient to establish probable cause" that he had murdered a man.  445 U.S. at 576.  When Payton didn't answer his door, the officers broke in with the intention of arresting him.  *Id.*  Although they determined that Payton wasn't home, they discovered evidence of his crime in plain view, and Payton later turned himself in.  *Id.* at 576–77.  In the second case, officers obtained the address of Obie Riddick, whose robbery victims had identified as their assailant.  *Id.* at 578.  Without obtaining a warrant, the officers knocked on Riddick's door, saw him when his young son opened it, and entered the house and arrested him on the spot.  *Id.*  Both Payton and Riddick were convicted based on evidence discovered in the course of the officers' warrantless entries into their homes, and the New York Court of Appeals affirmed both convictions.  *Id.* at 579.  The Supreme Court reversed both, holding that "[a]bsent exigent circumstances"—and even assuming the existence of probable cause—the threshold of the home "may not reasonably be crossed without a warrant."  *Id.* at 590.

Our precedent reconciling *Santana* and *Payton* is clear.  We have expressly refused to read *Santana* "as allowing physical entry past *Payton*'s firm line . . . without a warrant or an exigency."  *McClish v. Nugent*, 483 F.3d 1231, 1246 (11th Cir. 2007).  *Santana*'s description of "the doorway of [a] house" as a

11

"public place," 427 U.S. at 40, 42 (quotation marks omitted), we have said, shouldn't be misinterpreted to mean that officers have a right to enter and arrest anyone standing in an open doorway without a warrant. *McClish*, 483 F.3d at 1247. Instead, we have explained, it simply means that a person standing in a doorway is in "public" in the sense that he puts himself in the "the plain view" of any officers observing from the street. *Id.* (quoting *Hadley v. Williams*, 368 F.3d 747, 750 (7th Cir. 2004)). In so doing, the suspect "may well provide an officer with a basis for finding probable cause or an exigency," but he does not "surrender or forfeit every reasonable expectation of privacy . . . including . . . the right to be secure within his home from a warrantless arrest." *Id.*; *see also Moore v. Pederson*, 806 F.3d 1036, 1050 n.14 (11th Cir. 2015) (observing that "*McClish* clearly established that an officer may not execute a warrantless arrest without probable cause and either consent or exigent circumstances, even if the arrestee is standing in the doorway of his home when the officers conduct the arrest"). The bottom line, post-*Payton*: Unless a warrant is obtained or an exigency exists, "any physical invasion of the structure of the home, by even a fraction of an inch, [is] too much." *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (quotation marks and citation omitted).

In order to prevail based on *Santana*, then, Swindell would have to point to some exigent circumstance, but the exigencies present in *Santana* are absent here.

12

*Santana* primarily involved the "hot pursuit" exception to the warrant requirement, and the Court there separately alluded to the risk that evidence would be destroyed. *Id.* at 43. Neither of those exigencies, however, can justify Bailey's arrest.[6]

In *Santana*, the suspect's arrest was "set in motion in a public place," a crucial element of the hot-pursuit exception. *Id.* at 43. It was only after officers shouted "police" that Santana retreated fully inside her house. *Id.* at 40. Bailey's arrest, by contrast, wasn't initiated in public, and therefore can't qualify as a "true hot pursuit." *Id.* at 42 (quotation marks omitted). Swindell gave no indication that he intended to arrest Bailey before he threatened to tase him and simultaneously tackled him from behind. Taken in the light most favorable to Bailey, the facts demonstrate that the threat and tackle occurred only *after* Bailey had retreated entirely into the house, so "hot pursuit" provides no justification for the warrantless entry here. If *Santana* were understood to cover warrantless arrests "set in motion" *inside* a home, then the hot-pursuit exception would quite literally swallow *Payton*'s rule.

---

[6] Swindell arguably waived any argument that his warrantless arrest of Bailey was supported by exigent circumstances because he didn't raise the issue in his brief. *See United States v. Nealy*, 232 F.3d 825, 830 (11th Cir. 2000) ("Parties must submit all issues on appeal in their initial briefs." (citations omitted)). Read charitably, his citation of *Santana* could be understood to invoke the exigencies on which the Court in that case relied, so we will analyze those circumstances here.

13

The *Santana* Court also relied in part on "a realistic expectation that any delay would result in destruction of evidence." *Id.* at 43 (citation omitted). Swindell's counsel expressly disclaimed any reliance on this kind of exigency at oral argument—and with good reason, as the circumstances here posed no risk that any evidence would be destroyed. Indeed, with respect to the charge for which Bailey was arrested—resisting Swindell's initial effort to detain him, in violation of Fla. Stat. § 843.02—there wasn't any physical evidence; rather, all relevant evidence existed in the minds of Swindell, Bailey, Evelyn, and Jeremy.[7]

Because Swindell can point to no exigency, he violated the Fourth Amendment when he crossed the threshold to effectuate a warrantless, in-home arrest.

\* \* \*

Of course, Swindell loses the cover of qualified immunity only if the constitutional right that he violated was "clearly established" at the time of the events in question. *McClish*, 483 F.3d at 1237. It was.

---

[7] Although Swindell didn't present any exigent-circumstances arguments in his brief, he did raise a concern about officer safety at oral argument, contending that Swindell feared that Bailey would return to the porch with a weapon. That argument is not only waived, *see Nealy*, 232 F.3d at 830, but also wholly speculative, as there was no evidence to suggest that anyone had a weapon pre-arrest.

Qualified immunity "operates 'to protect officers from the sometimes hazy border[s]'" of constitutional rules. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quotation mark omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). In so doing, it "liberates government agents from the need to constantly err on the side of caution." *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003). Here, though, Swindell crossed a constitutional line that—far from being hazy—was "not only firm but also bright." *Kyllo*, 533 U.S. at 40. That line—no warrantless in-home arrests absent exigent circumstances—was drawn unambiguously in *Payton*, traces its roots in more ancient sources, and has been reaffirmed repeatedly since. *See, e.g.*, *Kirk v. Louisiana*, 536 U.S. 635, 636 (2002); *Kyllo*, 533 U.S. at 40; *Welsh v. Wisconsin*, 466 U.S. 740, 754 (1984); *see also Johnson v. United States*, 333 U.S. 10, 15 (1948). And to be clear, Swindell can't point to *Santana* as a source of uncertainty in the law. The defendant in *McClish* ruined that chance; he made the same "What about *Santana*?" argument, and we indulged it there, 483 F.3d at 1243, but in so doing we expressly rejected it on a going-forward basis, *id.* at 1243–48. Finally, to the extent that any ambiguity remained, we expressly reiterated *McClish*'s holding in *Moore*, explaining—in terms that apply here precisely—that a warrant (or exception) is *always* required for a home arrest "even if the arrestee is standing in the doorway of his home when the officers conduct the arrest." 806 F.3d at 1050 n.14.

15

Because Swindell violated clearly established Fourth Amendment law, he is not entitled to qualified immunity.

## III

We hold that Swindell violated the Fourth Amendment's protection against unreasonable seizures when he arrested Bailey inside his home.  We further hold that Bailey's right to be free from a warrantless, in-home arrest was clearly established and that no exception to the warrant requirement even plausibly applies in this case.  Accordingly, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.