[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11250

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

LONNIE LORENZO HOLLINGSWORTH, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 5:21-cr-00035-JA-PRL-1

_____

Before WILSON, ROSENBAUM, and LUCK, Circuit Judges.

PER CURIAM:

Lonnie Hollingsworth, Jr., appeals his conviction and sentence for unlawful possession of ammunition by a convicted felon. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2). Police officers found a single round of ammunition in Hollingsworth's backpack upon taking him into custody for an involuntary mental-health examination under Florida's Baker Act. *See* Fla. Stat. § 394.463. The district court denied Hollingsworth's motion to suppress the evidence, concluding that probable cause existed to detain him under the Baker Act. Then, after finding Hollingsworth guilty at a bench trial, the court sentenced him to three years of imprisonment, with three years of supervised release to follow. Among the conditions of his supervised release, he was required to notify others of any risk he posed to them, as instructed by the probation officer. On appeal, he argues that suppression was required because the officers lacked probable cause to detain him under the Baker Act, and that the district court plainly erred by imposing the risk-notification condition, which, in his view, unconstitutionally delegated judicial authority to the probation officer. After careful review, we affirm.

## I.

On April 5, 2021, Hollingsworth made a 911 call. Claiming an "emergency," he told the dispatcher to relay a message to Marion County Sheriff Billy Woods for Woods's role in a 2013 incident

involving Hollingsworth. The gist of the message was that, when "God can put [him] in a position to do it," Hollingsworth was "going to unload a whole fucking clip in his fucking face, in his whole fucking cranium in front of all his employees and his bosses." Hollingsworth continued to discuss the 2013 incident and then ended the call. During the call, Hollingsworth sounded angry and was cursing beyond what he said in the message set forth above.

Officer Robert Crossman was dispatched to a RaceTrac gas station in Ocala, Florida, to address the threatening 911 call. When Crossman arrived, Hollingsworth was outside livestreaming the events on his cell phone and "ranting" about the 2013 incident. Stating that he had unsettled business or "beef" from that incident, in which he had been shot multiple times, he demanded the "sheriff's department to come out in full force" and to "bring all your boys," including "helicopters and everybody," with "them guns drawn." He said he had "already died before" and "didn't care."

Soon after Crossman arrived at the scene, Officer Shelby Prather arrived with her field trainee, Officer Branden McCoy and took over primary responsibility. The officers questioned Hollingsworth further about the 911 call and the 2013 incident.

Hollingsworth explained to the officers that he had been shot multiple times during an incident in March 2013. It appears that he later pled guilty to and was convicted of attempted strongarm robbery based on that incident. But Hollingsworth believed that the Marion County Sheriff's Office had lied about the circumstances surrounding the shooting. He also discussed problems

obtaining disability benefits for his injuries or other redress for the 2013 incident because of his conviction. It's not clear whether Woods, who became sheriff in 2017, played any personal role in the prior incident.

Hollingsworth was generally calm, cooperative, and responsive during the encounter, but his "behavior was pretty erratic and obsessive about . . . the incident that occurred back in 2013," according to Prather. He continued to insist that Sheriff Woods and the Sheriff's Office respond to the scene and that he had business or a score to settle. He denied threatening Sheriff Woods in the 911 call, and he was "adamant" that the officers listen to the recording. Hollingsworth also denied wanting to harm anyone, stating that he wanted only to meet Sheriff Woods.

Based on Hollingsworth's behavior at the scene, neither Crossman nor Prather believed Hollingsworth met the criteria for the Baker Act (or any criminal offense). Crossman told Prather that Hollingsworth had called 911 "to vent," that he did not want to hurt himself or anyone else and knew where he was, and that RaceTrac "love[d] him." Likewise, Prather told her supervisor, Sergeant Kyle Howie, who had arrived on the scene but did not interact with Hollingsworth, that the circumstances were "not 329"—329 being code for the Baker Act—and that she would close the case with an incident report "just because it's kind of weird."

When they made these observations, though, the officers had not yet listened to Hollingsworth's 911 call, which Prather believed was relevant to the investigation. As a result, Hollingsworth

was detained outside the RaceTrac for approximately 45 minutes while Howie obtained a recording of the call. After listening to the recording, Prather notified Hollingsworth that Hollingsworth would be detained and transported for examination under the Baker Act.

Hollingsworth was handcuffed and searched. While being checked for and questioned about weapons, Hollingsworth told the officers he was homeless and did not own any weapons, and he asked the officers to collect his backpack by the RaceTrac. Crossman retrieved the backpack and searched it, finding a single 9mm bullet, which Hollingsworth later described as his "lucky bullet." Because Hollingsworth was a convicted felon, he was taken to jail for unlawful possession of ammunition, rather than to a mental-health facility for evaluation.

## II.

After his indictment on one count of unlawful possession of ammunition by a convicted felon, *see* 18 U.S.C. § 922(g), Hollingsworth moved to suppress the evidence, arguing that the officers lacked probable cause to seize him under the Baker Act or to search his backpack.

At an evidentiary hearing, the government presented the testimony of the four police officers involved: Crossman, Howie, McCoy, and Prather. In addition to the witness testimony, both the government and Hollingsworth introduced body-worn camera footage from Crossman, McCoy, and Prather; the audio and

transcript of a 911 call placed by Hollingsworth on April 5, 2021; and the rear-seat in-car camera video from Prather's patrol vehicle.

After the hearing, the magistrate judge issued a report recommending the denial of the motion to suppress. In the magistrate judge's view, the officers had probable cause to detain Hollingsworth under the Baker Act based on the totality of the circumstances. The magistrate judge noted that Hollingsworth, after threatening in a 911 emergency call to shoot Sheriff Woods in the head, "continued to obsess over the opportunity to meet with Sheriff Woods" and demanded that he and the Sheriff's Office respond to the scene with their guns drawn. Based on these comments, the magistrate judge concluded that the officers had probable cause to conclude that "there was a substantial likelihood that Hollingsworth would inflict serious bodily harm to Sheriff Woods or others in the near future."

Hollingsworth filed objections, arguing that his behavior at the RaceTrac established he was not a threat and instead simply wanted to air his grievances. He also asserted that the 911 call was not an "actual threat," but was, "at worst, a conditional threat that gives no indication [he] 'will' cause serious bodily harm in the near future," as required by the Baker Act. The district court overruled the objections and adopted the magistrate judge's report and recommendation.

Thereafter, the district court found Hollingsworth guilty at a bench trial based on stipulated facts, and it sentenced him to 36 months of imprisonment, followed by three years of supervised

release.  Among other "Standard Conditions" of supervised release, the court imposed the following risk-notification condition:

> If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.

Hollingsworth did not object to any condition of supervised release.  This appeal followed.

### III.

We start with the district court's denial of the motion to suppress.  We review the court's factual findings for clear error and its application of the law to the facts *de novo*.  *United States v. Pierre*, 825 F.3d 1183, 1191 (11th Cir. 2016).  In doing so, we view the evidence in the light most favorable to the prevailing party in the district court, affording substantial deference to the factfinder's credibility judgments.  *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012).

Under the Fourth Amendment, an individual has a right to be free from "unreasonable searches and seizures," *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007), including seizures "to ascertain that person's mental state (rather than to investigate suspected criminal activity)," *Roberts v. Spielman*, 643 F.3d

899, 905 (11th Cir. 2011).  To be reasonable, a custodial seizure must be supported by probable cause.  *Skop*, 485 F.3d at 1137; *see Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022) ("Mental-health seizures are reasonable under the Fourth Amendment when the officer has probable cause to believe that the seized person is a danger to himself or to others.").

The question here is whether there was probable cause to take Hollingsworth into custody under Florida's Baker Act, the only justification offered for the seizure.  *See Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1126 (11th Cir. 2021) (reviewing whether arguable probable cause existed to detain a plaintiff under Florida's Baker Act in a civil rights action); *cf. Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1333 (11th Cir. 2004) ("Whether a particular set of facts gives rise to probable cause . . . to justify an arrest for a particular crime depends, of course, on the elements of the crime.").  We look to the "totality of the circumstances to determine whether . . . probable cause existed to detain [Hollingsworth] under Florida's Baker Act." *Khoury*, 4 F.4th at 1126.

Florida's Baker Act permits police officers to take a "person who appears to meet the criteria for involuntary examination into custody" and deliver the person to a mental-health facility.  Fla. Stat. § 394.463(2)(a)2.  The criteria provide, as relevant here, that there must be "reason to believe" the following: (1) the "person has a mental illness"; (2) he has refused a voluntary examination or is unable to make that decision for himself; and (3) "[t]here is a substantial likelihood that without care or treatment the person will

cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior." Fla. Stat. § 394.463(1).

Relevant recent behavior may include "causing, attempting, or threatening to do [serious bodily] harm." *D.F. v. State*, 248 So. 3d 1232, 1234 (Fla. Dist. Ct. App. 2018). That an individual might need treatment for a mental illness alone is insufficient to justify involuntary commitment. *Id.*; *Williams v. State*, 522 So. 2d 983, 984 (Fla. Dist. Ct. App. 1988). So too are "[v]ague notions about what a person might do—for example, a belief about some likelihood that without treatment a person might cause some type of harm at some point." *Khoury*, 4 F.th at 1126.

Here, the district court did not err in denying Hollingsworth's motion to suppress. The record shows that Hollingsworth made a 911 call threatening "to unload a whole . . . clip in [Sheriff Woods's] . . . face, in his whole . . . cranium in front of all his employees and his bosses." Then, once the officers arrived, Hollingsworth was fixated on the alleged injustice he suffered in 2013 and the alleged culpability of the Sheriff's Office. And he repeatedly sought to provoke a confrontation with Sheriff Woods and "all [his] boys" with "them guns drawn," stating that he "didn't care" about the consequences because he had "already died before."

Given this recent behavior, which included threatening to do serious bodily harm to Sheriff Woods and then being "erratic and obsessive" about meeting the sheriff to settle an old score, probable cause existed to believe that Hollingsworth had a mental

illness and that there was a "substantial likelihood that without care or treatment [he] [would] cause serious bodily harm to . . . others in the near future."[1]  Fla. Stat. § 394.463(1); *D.F.*, 248 So. 3d at 1234; *see also Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019) (explaining that "[p]robable cause is not a high bar" and does not require "convincing proof" (quotation marks omitted)).  Because that recent behavior properly grounded the officers' Baker Act assessment, we need not consider whether it was reasonable for the officers to rely on the criminal history Hollingsworth disclosed.

While Hollingsworth was generally calm, respectful, and nonthreatening with the officers, and nothing indicates he was delusional or incompetent, we disagree that his behavior "dispelled any suspicion" about the risk he posed, as he asserts.  Notably,

---

[1] Hollingsworth also challenges whether there was reason to believe he either had refused a voluntary examination or was unable to make that decision for himself.  *See* Fla. Stat. § 394.463(1)(a).  But he does not identify any authority applying this requirement to invalidate a Baker Act seizure.  Nor would its absence result in a Fourth Amendment violation in this case.  Because we have concluded that Hollingsworth's seizure was supported by probable cause to believe he was dangerous to others, it follows that the seizure was reasonable under the Fourth Amendment, notwithstanding that a defect under state law may or may not exist.  *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022) ("Mental-health seizures are reasonable under the Fourth Amendment when the officer has probable cause to believe that the seized person is a danger to himself or to others."); *see also Virginia v. Moore*, 553 U.S. 164, 174–76, 178 (2008) (holding that an officer's violation of state law arrest rules did not render an arrest unconstitutional because "it is not the province of the Fourth Amendment to enforce state law").

although he denied making any threats to Sheriff Woods in the 911 call or having any violent intent, the recording reflected a graphic threat to murder the sheriff in a public setting. And Hollingsworth seemed obsessed with confronting the sheriff over the 2013 incident, which had affected his life profoundly. He also indicated he had exhausted other means of redress, potentially a sign that his behavior was escalating. So on hearing the recording, the officers had reason to discount the credibility of Hollingsworth's assurances at the scene that he did not want to harm anyone. *See Ingram*, 30 F.4th at 1250–51 (holding that, in light of a recent suicide attempt, an officer "was not required to believe [the suspect's] innocent assurances that he no longer desired to harm himself"). Plus, officers are not "required to sift through conflicting evidence or explanations or resolve issues of credibility" when assessing probable cause. *Huebner v. Bradshaw*, 935 F.3d 1183, 1188 (11th Cir. 2019) (quotation marks omitted).

That the officers did not believe the Baker Act criteria were satisfied before listening to the 911 call recording does not make the resulting seizure unlawful. The recording was part of the totality of the circumstances facing the officers, and it could reasonably inform an officer's judgment about Hollingsworth's behavior at the scene and whether the Baker Act criteria were satisfied. *See Khoury*, 4 F.4th at 1126; *Huebner*, 935 F.3d at 1187.

Hollingsworth suggests it was unreasonable for the officers to detain him "outside in the sun without water" for 45 minutes so they could listen to a recording of the 911 call. But he made no

distinct claim that he was subject to an unlawful investigatory detention while the officers obtained the recording, nor would he prevail on such a claim if he had. *See e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) ("[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."). The recording was relevant to the investigation of the 911 call, which the officers believed contained threats against a local public official. And there is no evidence that Hollingsworth, though not free to leave, was detained longer or under more severe conditions than necessary to obtain the 911 call recording. *See United States v. Gil*, 204 F.3d 1347, 1350–51 (11th Cir. 2000) (investigatory stops must be "reasonably related in scope to the circumstances which justified the interference in the first place" (quotation marks omitted)).

For these reasons, we affirm the denial of Hollingsworth's motion to suppress.

## IV.

Hollingsworth also challenges a condition of his supervised release. Because this challenge was raised for the first time on appeal, our review is for plain error. *United States v. Nash*, 438 F.3d 1302, 1304 (11th Cir. 2006). To constitute plain error, the district court must have made an error that was plain and that affects Hollingsworth's substantial rights. *Id.* When plain error occurs, we may reverse if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

"A court may not delegate a judicial function to a probation officer" because "[s]uch a delegation would violate Article III of the United States Constitution." *United States v. Bernardine*, 237 F.3d 1279, 1283 (11th Cir. 2001). "[I]mposing a sentence on a defendant is a judicial function." *United States v. Heath*, 419 F.3d 1312, 1315 (11th Cir. 2005).

To determine whether the district court improperly delegated its sentencing authority, we draw a distinction between the delegation "of a ministerial act or support service" and "the ultimate responsibility" of imposing the sentence. *Nash*, 438 F.3d at 1304–05. The district court may not delegate the ultimate responsibility of deciding whether to impose a condition of supervised release. *Id.* at 1305. But the district court may delegate the ministerial function of how, when, and where the defendant must comply with the condition. *Id.*

The Guidelines recommend a number of "standard" conditions for all terms of supervised release. U.S.S.G. § 5D1.3(c). Number twelve on the list is a risk-notification condition, which states,

> If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

U.S.S.G. § 5D1.3(c)(12).

In *Nash*, we held that an earlier version of this condition did not improperly delegate judicial authority.  438 F.3d at 1306.  The defendant in that case was obligated to "notify third parties of risks that may be occasioned by [his] criminal record or personal history or characteristics" "[a]s directed by the probation officer."  *Id.*  We explained that, under the language of the condition, "[t]he probation officer may 'direct' when, where, and to whom notice must be given, but may not unilaterally decide whether Nash 'shall' do so at all."  *Id.*  For that reason, we held that the condition did not impermissibly delegate the ultimate responsibility of determining Nash's sentence to the discretion of the probation officer.  *Id.*

After we decided *Nash*, the Sentencing Commission revised the risk-notification condition to clear up "potential ambiguity in how the condition [was] phrased."  U.S. Sentencing Guidelines App. C, Amend. 803 (2016) (citing *United States v. Thompson*, 777 F.3d 383, 379 (7th Cir. 2015) (criticizing the former risk-notification condition as vague)).  It rephrased the condition to make it "easier for defendants to understand and probation officers to enforce," *id.*, though it did not address *Nash* or the delegation issue.

We have not addressed the current version of the risk-notification condition (Standard Condition 12) in a published opinion. Most circuits to address the issue have held that the current version does not improperly delegate judicial authority.  *United States v. Cruz*, 49 F.4th 646, 654 (1st Cir. 2022); *United States v. Mejia-Banegas*, 32 F.4th 450, 452 (5th Cir. 2022); *United States v. Janis*, 995 F.3d 647, 653 (8th Cir. 2021); *United States v. Hull*, 893 F.3d 1221, 1226

(10th Cir. 2018); *see also United States v. Gibson*, 998 F.3d 415, 423 (9th Cir. 2021) (stating that "Standard Condition 12 is constitutional and may be imposed in appropriate cases" in part because "probation officers do not have unfettered discretion under this condition"). One circuit, though, has vacated the imposition of a risk-notification condition as an "improper delegation of judicial power." *United States v. Cabral*, 926 F.3d 687, 699 (10th Cir. 2019); *see also United States v. Boles*, 914 F.3d 95, 112 (7th Cir. 2019) (vacating and remanding for the court "to clarify the scope" of the risk-notification condition because, as written, it "gives the probation office unfettered discretion").

Under our precedent, "where neither the Supreme Court nor this Court has ever resolved an issue, and other circuits are split on it, there can be no plain error in regard to that issue." *United States v. Aguillard*, 217 F.3d 1319, 1321 (11th Cir. 2000). *But cf. Heath*, 419 F.3d at 1319 (holding that plain error occurred where other circuits were unanimously in favor of the defendant's view). Because other circuits are split on, if not mostly against, the view that the risk-notification condition (Standard Condition 12) improperly delegates judicial authority to probation officers, and because we have upheld a prior version of that condition and have not spoken on the current one, Hollingsworth cannot establish that any error was plain or obvious under current law. *See Aguillard*, 217 F.3d at 1321.

For these reasons, we affirm Hollingsworth's conviction and sentence.

16　　　　　　　　　　Opinion of the Court　　　　　　　　22-11250

AFFIRMED.